Argued September 15, affirmed October 6, 1971

## GROWERS REFRIGERATING CO., INC. et al, *Respondents, v.* AMERICAN MOTORISTS INSURANCE COMPANY, *Appellant.*

488 P2d 1358

Stewart M. Whipple, Portland, argued the cause for appellant. With him on the briefs were Seitz, Whipple & Johansen and Alan H. Johansen, Portland.

William G. Purdy, Medford, argued the cause for respondents. With him on the brief were Frohnmayer & Deatherage, Medford.

Before O'Connell, Chief Justice, and Holman,* Tongue, Howell and Bryson, Justices.

TONGUE, J.

This is an action on an insurance policy to recover for damage to pears stored in plaintiffs' cold storage plant as the alleged result of contamination following an ammonia leak in the refrigeration equipment. After trial before a jury, judgment was entered on a verdict in favor of plaintiffs in the sum of $17,855.48.

In appealing from that judgment defendant contends that the trial court erred in denying its motions for involuntary nonsuit and for a directed verdict on the grounds: (1) that there was no evidence that the loss was caused by an "occurrence" as defined by the policy and (2) that there was insufficient evidence of loss or damage within the terms of the policy. Defendant also assigns as error an instruction given by the court which defendant contends to have been placed upon it an improper burden of proof.

---

* Holman, J., did not participate in this decision.

1. *The Damage to the Pears Resulted from an "Occurrence" within the terms of the Insurance Policy.*

By the terms of the insurance policy defendant agreed to pay plaintiffs for loss or damage resulting from an "occurrence" as defined by the policy, subject to exclusions, conditions and other terms of the policy. The pertinent portions of the policy on this issue are as follows:

" 'Occurrence' shall mean only
" \* \* \* \* \*

"d) contact or permeation of insured property by ammonia or refrigerant; but
" 'Occurrence' shall not mean
" \* \* \* \* \*

"iv. any sudden and unforeseen damage resulting from any testing or purging of any refrigeration system or of the equipment or apparatus used solely with said system; \* \* \*."

Defendant contends that any loss or damage in this case was damage "resulting from" the "purging" of the system and therefore was not an "occurrence" as defined in the policy. In order to determine the validity of this contention it is necessary to consider the facts.

Plaintiffs' plant includes a "precooling" room some 40 feet wide and from 60 to 80 feet long, with cooling or "diffuser" units hanging from the ceiling. It was filled with 630 or 640 pallet bins of pears, or between 15 and 17 carloads.

On the night of September 27, 1969, the plant engineer, Mr. Orgain, was informed by the night watchman that the room was "warming up" and that one of the diffuser units was not working properly. Upon arriving at the plant he found that warm, in-

stead of cold, air was blowing out of one of the units. He then undertook to open a "trap" in the pipeline of that unit for the purpose of cleaning a screen in that trap to remove possible oil, particles of slag or other substances which sometimes collected in the screens of such traps and which might have been the cause of the trouble.

This particular trap was on a section of pipe three-quarters of an inch in diameter and was located just "ahead" of an automatic solenoid switch which controlled the flow of ammonia through the pipes of the unit. To make possible the cleaning of the screen in the trap without permitting the escape of ammonia from the entire unit, two hand-operated shut-off valves were located on the pipe, one on each side of the trap, and approximately three feet apart. Thus, when these valves were closed, the trap could be opened so as to clean the screen and only the ammonia in that short section of pipe would escape. That amount of ammonia was estimated as approximately one-half pint, assuming the pipe to be of that size, as testified by plaintiffs' witness.

According to plaintiffs' testimony, the release of that amount of ammonia would not normally cause damage to the pears stored in a "precooling" room of that size and no pears were stored close enough to that trap to be damaged by the escape of that small amount of ammonia.

The cleaning of the screens in the traps of these refrigeration units was recognized to be a more or less routine maintenance operation, to be performed while the rest of the units continued to operate, and was apparently done "quite often."

On that particular night, Mr. Orgain, plaintiffs'

engineer, shut the two hand-operated valves so as to isolate the "area" between them and then loosened the bolts on the bottom of the trap to permit the ammonia in that section of the pipe to escape, which he said "roughly takes five minutes or so." Although he had previously performed this operation on other units in the plant, he had never previously done so on this particular unit—the plant then having been in operation less than two months.

While waiting for the ammonia to escape Mr. Orgain "got back down off the catwalk," because the ammonia "gets pretty strong." Upon returning to clean the screen, however, he found that ammonia was still escaping. He testified that he then tried to tighten the valves by hand, but was unable to do so, not having his wrenches with him, and then "had to get back down out of there" because of the escaping ammonia.

Mr. Orgain then called the fire department and went back a third time with the fireman, after getting a mask, and tightened the bolts on the bottom of the trap so as to "shut off" the ammonia. By that time vapor from the ammonia was "coming out the door" about two feet above the ground and "looked like steam or fog."

Two days later Mr. Orgain went back and had no trouble closing the valves. He then removed the screen from the trap and upon cleaning it found particles of slag in the screen. There was testimony that such particles resulted from welding and "cutting" operations during the recent installation of the refrigeration system and that this was one reason for installation of the trap.

Mr. Orgain also testified that although the two hand-operated valves operated properly, "as far as I know" on the previous occasion, if they had operated

properly when he "tightened them" on that occasion "it should have stopped that ammonia," but that the flow of ammonia "didn't stop." There was testimony that the ammonia in the pipes of the unit was under pressure of between 175 and 200 pounds per square inch.

Defendant called as an expert witness an engineer with experience in the design and operation of cold storage refrigeration equipment. He testified, in response to a hypothetical question, and over objection, that the loosening of the plate under the trap so as to permit ammonia to escape in order to clean the screen in the trap constituted a "purging" of the system. On cross-examination he also testified that the trap was part of a "purging system" for the removal of impurities from the system, but not for removal of the ammonia refrigerant itself; that "purging" consisted of the removal of foreign materials or contaminants from the system, and that the escape of ammonia was only incidental to the "purging" operation.

Plaintiffs offered no evidence to the contrary. Indeed, plaintiffs agree that the definition of "purge" includes "(1) To rid of whatever is impure or undesirable; cleanse; purify to rid, clear or free; (3) * * * (4) To remove by cleansing or purifying." Citing The Random House Dictionary, 1166-67. Under this definition, it would appear to be clear that while the term "purging" may include the removal of ammonia from a refrigeration system, it also includes the cleaning of screens in traps to remove particles of slag, oil, or other impurities in the refrigeration system.

In view of this concession by plaintiffs, there can be no reasonable contention that the term "purging" was intended to be limited to the removal of am-

monia or other refrigerant from the system or any part of it or that it was not intended to extend to and include the cleaning of oil, slag or other impurities from the screens, in traps in the refrigeration system, as in this case.

The sole basis for defendant's contention of noncoverage is that the loosening of the bolts on the bottom of the "trap," so as to clean the screen in the trap, resulting in the discharge of ammonia from that part of the system, was a "purging" of the "refrigeration system or its equipment or apparatus," within the terms of the exception to coverage as provided in the policy. Thus, defendant contends that there is no evidence that the shut-off valves did not operate properly, but that regardless of whether or not they leaked or otherwise malfunctioned or whether they operated properly, but were not closed completely by Mr. Orgain, "this was all part of the same ['purging'] operation, the closure of the valves being merely the first step in cleaning or purging the screen."

Plaintiffs contend, to the contrary, that a reasonable construction of the contract would limit the exclusion from coverage to losses that occurred as a result of a purging of the system or a portion of the system where the amount of ammonia introduced was that very amount intended to be released by the purging operation, but that this would not preclude coverage where the purging operation in and of itself did not cause the damage, as in this case. Thus, plaintiffs contend that the evidence in this case establishes that this loss "resulted from" causes other than a "purging."

At the time of argument counsel for defendant, when asked what risks were intended to be covered by the insurance policy, answered that the intent was

to cover "the risk of ammonia escaping." At the same time, he contended that the policy did not cover the escape of ammonia resulting from a "purging" operation. As previously noted, defendant contends that this result must follow regardless of whether or not the shut-off valves malfunctioned during a purging operation.

■ In resolving these conflicting contentions, we must bear in mind that although an insurance company is ordinarily entitled to the enforcement of an insurance policy as written by the company if its terms are clear and unambiguous, in the event of an ambiguity in the terms of an insurance policy, any reasonable doubt will be resolved against the insurance company and in favor of extending coverage to the insured. *Farmers Mut. Ins. Co. v. Union Pac. Ins. Co.,* 206 Or 298, 305, 292 P2d 492 (1956).

In addition, we must also bear in mind that while the primary rule of contract interpretation, including insurance contracts, is to ascertain the intent of the parties, if possible, it is nevertheless established in Oregon that an insurance policy "should be construed * * * in the sense in which the insured had reason to suppose it was understood." *Borglund v. World Ins. Co.,* 211 Or 175, 181, 315 P2d 158 (1957). See also *Jarrard v. Continental Casualty,* 250 Or 119, 126-7, 440 P2d 858 (1968).

■ Viewing the facts of this case in the light of that rule, we find it difficult to believe that the plaintiffs, as the insured parties to this insurance policy, would have had reason to suppose, upon reading the policy as a whole, that although one provision of the policy undertook to insure against loss resulting from the "contact or permeation of insured property by ammonia or refrigerant," the following policy pro-

vision was intended to exclude from coverage not only any loss from "contact or permeation of insured property by ammonia" resulting from the deliberate release of the amount of ammonia that would normally be released in a "purging" operation, but also excluded from coverage losses resulting from the wholly unintentional and accidental escape of ammonia because of some accident during a "purging" operation.

In other words, it is our opinion that it is one thing for the parties to have intended by that provision to exclude from coverage damage resulting from the release of ammonia in a normal "purging" operation, in which larger or smaller amounts of ammonia may be released, depending upon the nature and extent of the "purging" operation. It is quite another matter, however, for the parties to have intended by that provision to exclude from coverage damage resulting from the accidental release of ammonia as the result of some defect or malfunction in the refrigeration during the course of a "purging" operation.

We therefore conclude that the terms of the exclusion from coverage of "any sudden and unforeseen damage *resulting from* any testing or purging of any refrigeration system or of the equipment or apparatus used solely within said system" are ambiguous, depending upon the intention of the parties. We also conclude that while the insured had reason to believe that this provision would exclude from coverage damage resulting from the release of the amount of ammonia deliberately released during a "purging" operation, the insured also had reason to believe that all damage resulting from the accidental escape of ammonia would be covered by the general definition of "occurrence" and would not be excluded from coverage

by this provision, even if occurring during a "purging" operation.

■ This leaves for determination the question whether there was evidence in this case from which the jury could properly have found that the escape of ammonia through the shut-off valve was "accidental" in that it occurred because the valve malfunctioned when plaintiff's engineer attempted to close the shut-off valves. No specific instruction was submitted to the jury on that question and none was apparently requested by either party. The jury was instructed, however, to find for the defendant if it found that the damage "resulted from plaintiffs' purging of the refrigeration equipment or apparatus used solely within the system."

We are fully aware of defendant's contention that there was no evidence in this case that either valve was defective or malfunctioned. Since, however, Mr. Orgain testified that he attempted, without success, to shut the valves (which were designed as hand-operated valves), but that the ammonia continued to escape from the bottom of the trap, we conclude that the jury could properly have found that one of the valves malfunctioned and that this was the cause of the escape of ammonia in a quantity large enough to result in damage to the pears in this case.

For these reasons, and after examining the entire record, we conclude that there was sufficient evidence to support a finding by the jury that the damage in this case resulted from the accidental escape of ammonia and did not result from a "purging" of the refrigeration system. We must presume, after the verdict in favor of plaintiffs, that the jury made such a finding. We therefore conclude that the damage to

plaintiffs' pears was covered by the insurance policy in this case.

■ Defendant also contends that the trial court erred in its instruction to the jury regarding the burden of proof of coverage, for various reasons. At the time of trial, however, the only exception made by defendant's counsel was that the instruction, as given, was "inaccurate because it fails to qualify properly the instruction with respect to whether it was an occurrence within the definition of the policy" and should have explained that "the mere fact that the pears were exposed to contamination or permeation by ammonia and there was damage would not automatically establish coverage."

While that exception may have indirectly involved some of the contentions now made by defendant on appeal, any such reference was far too remote and unclear so as to adequately point out such contentions to the trial judge, as required in order to constitute a good and sufficient exception. See *Mays v. Huling Buick Co.*, 246 Or 203, 424 P2d 679 (1967), and *Ross v. Cuthbert*, 239 Or 429, 438, 397 P2d 529 (1964). It follows that this assignment of error must fail for lack of a proper exception at the time of trial. Upon examining this instruction as a whole, however, we conclude that it was consistent with the pleadings in this case, including the affirmative defenses alleged by defendant.

2. *Plaintiffs' Evidence of Damages Was Not Insufficient.*

Defendant contends that plaintiffs' evidence of damages was "legally insufficient." Thus, defendant contends that "there was no substantial evidence that any pears were damaged" and "no evidence at all as to

the quantity of pears contacted or permeated with ammonia" or the "actual cash value" of such pears. Defendant also points out that the term "actual cash value" is the measure of damages provided by the policy and is defined as "the market value at the time of the occurrence or the value of the specified property prorated over the normal period of processing or storage, whichever is lesser."

Upon examining the record we find ample evidence of substantial damage to the pears stored in the warehouse by discoloration as a result of contact with ammonia. Although the evidence does not show "how many" pears were damaged, as contended by defendant, the test to be applied under the terms of the policy is the loss or decline in "market value" of the pears that were stored in the warehouse as the result of contamination by ammonia.

Plaintiffs offered evidence that following the contamination by ammonia, the Bosc pears in the warehouse (which were owned by various orchards) were sorted and packed as quickly as possible, including bathing and rinsing the pears to minimize the damage. Plaintiffs also offered computations prepared by its accountant based upon a comparison of the proceeds of contaminated pears with the proceeds of uncontaminated pears ("comparing how they graded out"), and on that basis computed the loss of income based upon the "difference in gradation," using "the actual figures for the Bosc pool that year." For the Comice pears (which were packed elsewhere because plaintiff was not equipped to pack Comice pears), plaintiffs' claim of damages was the amount actually paid to the owner of such pears, computed upon the basis of a "pack-out" report showing the "average return per lug." Similarly, plaintiffs' claim of damages

for a much smaller amount of Bartlett pears was based upon the amount paid to the purchaser of such pears as a result of the adjustment of a claim for ammonia damage.

All of the foregoing evidence was received without objection, either on the ground that the amounts paid in settlement of claims had not been shown to be reasonable, or on any other ground. Thus, the only question is the sufficiency of such evidence to satisfy the terms of the insurance contract, under which the measure of damages is the cash or market value of the pears.

We have previously recognized that "* * * since the allowance of damages is to award just compensation without enrichment, there is no universal test for determining the value of property injured or destroyed and that the mode and amount of proof must be adapted to the facts of each case." *Oregon Mutual Fire Ins. Co. v. Mathis,* 215 Or 218, 224-25, 334 P2d 186 (1959). Thus, we have held that in the case of partial damage to property in which the measure of recovery is the amount of decrease in value of the property, the cost of making repairs may be admissible and often may be the only practical means of determining the loss suffered. *In Re Stout's Estate,* 151 Or 411, 423-24, 50 P2d 768 (1935). See also *Oregon Mutual Fire Ins. Co. v. Mathis, supra,* at 225. Accordingly, we held in *Murphy v. Hawthorne,* 117 Or 319, 327, 244 P 79 (1926), that while proof of "before and after" value of a damaged automobile may be preferable, "* * * presumptively, at least, the difference in its value before and after it was injured would be the amount that it would cost to repair it, and restore it to its former condition * * *."

■ We recognized that this is not a case involving

the cost of repairs. We also agree that it would have been preferable for plaintiffs in this case to offer testimony framed more precisely in terms of the difference in the cash or market value of the pears before and after they were contaminated by ammonia. We nevertheless hold, however, that under the particular facts of this case evidence showing a comparison of the amounts received from contaminated and uncontaminated pears, together with evidence of the amounts paid in the adjustment of claims for contamination damage to the owners of the pears, was not only admissible, but that presumptively, and in the absence of evidence to the contrary, such amounts represented the difference between the value of the pears before and after they were contaminated by ammonia.

The jury in this case was properly instructed on the issue of damages in terms of cash or market value, as required by the provisions of the policy. We hold that there was sufficient evidence to support its verdict awarding damages to plaintiffs.

■ Finally, defendant contends that by the terms of the insurance policy plaintiffs were required to prove that the market value of the pears at the time that they were damaged was not greater than their value "prorated over the normal period of processing and storage." We hold, however, that under the facts of this case, including the terms of the insurance policy, if defendant had reason to believe that a computation of value on such a prorata basis would have resulted in a "lesser" amount, it had the burden of proving such a contention. Cf. *Clouse v. St. Paul Fire & Marine Ins. Co.*, 152 Neb 230, 40 NW2d 820, 826, 15 ALR2d 1008 (1951).

For all of these reasons, the judgment of the trial court is affirmed.