Argued January 28, affirmed June 14, 1972

WULFF ET AL, *Respondents, v.* SPROUSE-REITZ
CO., INC. ET AL, *Appellants.*

498 P2d 766

*Ridgway K. Foley, Jr.,* Portland, argued the cause for appellants. With him on the briefs were Souther, Spaulding, Kinsey, Williamson & Schwabe, Roland F. Banks, Jr., and J. Laurence Cable, Portland.

*Ronald G. Stephenson,* Portland, argued the cause for respondent Safeco Insurance Company of America. With him on the brief were Bullivant, Wright, Johnson, Pendergrass & Hoffman, and Douglas G. Houser, Portland.

*Don G. Swink,* Portland, argued the cause for respondents Wulff. With him on the brief were Bailey, Swink, Haas & Malm, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, HOWELL, and BRYSON, Justices.

BRYSON, J.

This is an action at law by the owners of a house and personal property and the insurance company which insured the property, to recover damages against the defendants Northern Electric Co., a corporation, and Sprouse-Reitz Co., Inc., a corporation, the manufacturer and retailer, respectively, of an electric blanket which allegedly caused a fire and destroyed the owners' property.

The complaint sets forth two counts: that defendants were strictly liable for the manufacture and sale to plaintiffs Wulff of said blanket in a defective condition; that defendant Northern Electric was negligent in failing to test the blanket and in failing to warn of the volatile nature of the blanket.

Judgment was entered on the jury's verdict in favor of plaintiffs against both defendants. Defendants appeal, seeking a new trial, setting forth twelve assignments of error.

In August or September, 1968, Mrs. Wulff purchased two electric blankets from Sprouse-Reitz. The blankets were alleged to have been manufactured by defendant Northern Electric. Mrs. Wulff stored the blankets in a closet until October or November, 1968. At that time one of the blankets was placed on the bed of her younger daughter, Miss Olga Wulff. Mrs. Wulff reread the instructions before connecting the blanket and was careful not to tuck the blanket under the mattress. The instructions stated that the blanket was not to be left on when not being used; that it should not be allowed to "bunch together"; and objects should not be left on the blanket.

Miss Olga Wulff also read the instructions. She testified that the blanket was not used every night and the electric controls were never set more than one-third of the maximum heat. Miss Olga Wulff occupied a small second-floor bedroom in the Wulff home. There were three electrical outlets in Miss Wulff's carpeted room. On the day of the fire, December 17, 1968, the electric blanket was plugged into one of the outlets and a floor lamp was connected to another. No one was in the house from 7:30 a.m. until approximately 5 p.m., when Mrs. Wulff's older daughter, Maria, returned home.

After sleeping several hours, Maria was awakened by a phone ringing. She noticed a peculiar odor and began searching for its source. After looking downstairs, she went to the second floor and noticed the odor becoming more intense as she approached her sister's bedroom. She opened the door of that bedroom and found the room filled with thick smoke. She opened a window in the hall to let the smoke out. The smoke had risen, allowing Maria to see the blanket "[c]harred and glowing with little red sort of like glowing sparks." The charred area was confined to the middle part of the blanket, which lay perfectly flat on the bed. She then ran downstairs and attempted to phone the fire department but the phone was dead. She secured a garden hose and ran it upstairs; switched off the upstairs electricity; and turned on the water. She soaked the bed thoroughly and sprayed water on the carpet, walls and ceiling. She returned downstairs and, discovering water dripping through the ceiling of the living room, placed a number of pans to protect the carpet. She then fainted.

Sometime later Maria was awakened by a loud noise. She saw flames engulfing the stairwell and a bright orange color from the fire. She ran to a neighbor's house and called the fire department. Testimony and exhibits reveal the house and contents were almost totally destroyed by the fire.

██ The defendants first assert "the court erred in giving plaintiffs' Requested Instruction No. 2 informing the jury there were no differences between direct and circumstantial evidence." The court instructed:

"There are, generally speaking, two types of evidence from which a jury may possibly find the truth as to facts of a case. One is direct evidence such as the testimony of an eye witness. The other

is indirect or circumstantial evidence, the proof of a chain of circumstances pointing to the existence or non-existence of certain facts.

"As a general rule the law makes no distinction between direct and circumstantial evidence, but simply requires that the jury find the facts in accordance with the principles of all of the evidence in the case, both direct and circumstantial."

Defendants excepted to the instruction:

"I'll except to Instruction No. 2 upon the ground that I don't think that adequately states the law as to what direct and circumstantial evidence is, and I think the hypothetical or the example which they submit as an example of direct evidence unfairly commented on the evidence."

The first part of the exception does no more than tell the trial judge that counsel does not agree with the court. We find it raises no issue for our consideration. The second portion of the exception claims that the reference to "the testimony of an eye witness" as an example of direct evidence is a comment on the evidence by the judge. Defendants, before this court, argue that since Maria Wulff was the only eye witness in the case, the court prejudiced their cause by citing this as an example of direct evidence and thus giving it greater emphasis than the remaining evidence.

The court did not comment on the evidence but merely used the reference to "an eye witness" as a means, or method, to show by contrast the difference between direct and circumstantial evidence. *See, State v. Nortin*, 170 Or 296, 326, 133 P2d 252 (1943); ORS 41.070. We find no error in this assignment.

■ The defendants' next two assignments of error pertain to instructions given by the court. The excep-

tion taken by defendants to the two instructions are as follows:

"* * * I will except to that upon the ground that is not a proper holding in Schweiger vs. Selbeck and is not a proper statement of the holding in that case in connection with the effect of varying probable causes"; and

"Number 5, I'll object to the giving of that instruction. It was, as I recall, given as a definition of strict liability, but even more than that I'll object to it as not being in accordance with the Oregon law whether strict liability or negligence."

In each instance the exceptions are not specific and they fail to point out to the trial judge wherein the instructions were erroneous so that he might have an opportunity to correct any error. The exceptions were inadequate and therefore the matter is not before this court. *Hamilton v. Union Oil Company et al*, 216 Or 354, 367-68, 339 P2d 440 (1959). *See also, Growers Refrig. Co. v. Amer. Mtr. Ins.*, 260 Or 207, 488 P2d 1358 (1971); *Mays v. Huling Buick Co.*, 246 Or 203, 205, 424 P2d 679 (1967); *Padel v. Narits*, 247 Or 566, 430 P2d 1002 (1967); *Meyers v. Muno*, 236 Or 68, 71, 386 P2d 808 (1963); *LaBarge v. United Insurance Co.*, 221 Or 480, 488, 349 P2d 822 (1960).

■ The defendants also assign as error the court's modification of their Requested Instruction No. 2 by the insertion of the word *solely*. The instruction as given was as follows:

"A product is not in a defective condition when it is safe for normal handling. If the injury results *solely* from an abnormal handling, the seller or the defendants herein are not liable." (Emphasis supplied.)

The requested instruction is taken from Comment *h*

of Restatement § 402A. The transcript does not reveal why the word "solely" was inserted, and this is the only deviation from the instruction as requested. However, the court also instructed the jury:

> "* * * He [seller] is not liable when he delivers the product in a safe condition, and subsequent *mishandling* or other causes make it harmful when it is used." (Emphasis supplied.)

There is no reason for the insertion of the word "solely" but viewed in light of all of the instructions, we do not believe that the jury was misled or the defendants prejudiced by the modification in the instruction.

■ Defendants' assignment of error No. VI A states:

> "The circuit court erred in giving Uniform Jury Instruction No. 170.02 (3), relating to a failure to perform safely in accordance with average user expectations, where plaintiffs failed to allege and prove such a defect."

Defendants' exception to subsection three of the instruction, No. 170.02,[①] and their argument here is that plaintiffs failed to *allege* that the electric blanket was defective under the theory enunciated by subsection three thereof.

The first count of plaintiffs' pleadings placed the defendants on notice that plaintiffs were proceed-

---

[①] "DEFECTIVE PRODUCT INSTRUCTION NO. 170.02

"A product may be shown to be defective by proof of one (or more) of the following: [Eliminate subsections not involved in case.]

"1. A defect in manufacture;

"2. A defective design;

"3. Failure to perform safely under circumstances in which, from common knowledge, the average user reasonably could have expected the product to perform safely." Oregon Uniform Jury Instructions No. 170.02.

ing under the theory of strict liability and alleged that "[s]aid blanket was manufactured and sold in a defective condition unreasonably dangerous to plaintiffs, * * * and their property. * * * As a result of the defective condition of said blanket, * * * it caught fire and burned, while being used for its intended purposes * * *." The purpose of pleadings is to apprise the opposing party of the pleader's theory and what is contended so no one will be taken by surprise at the time of trial. Surely the defendants realized that plaintiffs were contending that the blanket did not perform safely under circumstances that plaintiffs, or an average user, would expect. We find no merit in this assignment of error.

█■ The defendants next assign as error the court's failure to instruct the jury that the law presumes the blanket supplied was not in a defective condition. Defendants' requested instruction was as follows:

> "2. No. 2.02—Disputable Presumptions: In this regard (a) The law presumes that all parties were free from negligence.
>
> (b) The law presumes that defendants did not supply the blanket in question in a defective condition unreasonably dangerous to a user."

The defendants argue that "[t]he law presumes that one is innocent of a crime or wrong, and that the law has been obeyed", ORS 41.360 (1), (33), and "[i]t is 'against the law' in the civil sense to convey a defective product."

The court instructed the jury that "the law presumes that all persons have obeyed the law and have been free from negligence." The court also instructed the jury that the seller is not "made an in-

surer against all harm caused by a user of its product," and "is not liable when he delivers the product in a safe condition and subsequent mishandling or other causes make it harmful when it is used"; and that "[t]he burden of proof that the product was defective at the time that it left the hands of the seller is on the plaintiff * * * and unless evidence is produced which will support the conclusion that it was defective, the burden has not been sustained." This court has held that the word "wrong" (ORS 41.360 (1)) includes "the commission of a tort." *Stage v. St. Pierre,* 224 Or 395, 399, 356 P2d 432 (1960). However, defendants' requested instruction, that the law presumes the blanket supplied was not in a defective condition, applied to the strict liability count and not to the negligent portion of plaintiffs' complaint. In a strict liability case the basic question is not whether the defendant acted wrongfully. In *Heaton v. Ford Motor Co.,* 248 Or 467, 474, 435 P2d 806 (1967), we stated, "The jury is supposed to determine the basically factual question of what reasonable consumers do expect from the product." We also stated, at page 473, "The argument has been made that the question of the ordinary consumer's expectations should be treated for jury purposes in the same way that the question of reasonable conduct in a negligence case is treated. But in deciding in a negligence case what is reasonable conduct, the jury is deciding in a context of 'right and wrong' how someone *should* have behaved." We are of the opinion that the law makes no presumption that the defendants did or did not "supply the blanket in question in a defective condition unreasonably dangerous to a user." No error was committed in refusing to give the requested instruction.

■ Defendants assign as error the trial court's (1) "allowing plaintiffs' witness, Mr. J. A. Anderson, to express numerous opinions as an expert," and (2) "in allowing Mr. Anderson to answer a hypothetical question which was not based on substantial evidence in the record." We gather from the questions asked Dr. Anderson by defendants' counsel in aid of objecting to his qualifications that at the time of trial they did not feel he was qualified as an expert because he had no specific experience in the manufacture of electric blankets. Dr. Anderson is a consulting chemical engineer with a BS degree in chemical engineering from Lafayette College, a Master's degree in chemical engineering and heat flow, and a "PHD" [sic] in chemical engineering from Iowa State College, and taught at the university level for four years. This included heat transference, fuels and combustions. He studied some electrical engineering as a requirement for receiving his degree in chemical engineering. He was employed by Dupont and spent a year and a half "in instruments," working with electricity and wires. He worked for American Cynanamid Company for five years and designed and laid out equipment "which involved resistance wiring and involved heat work." This work required him to consider problems in the use of electrical current. He was also employed by Georgia-Pacific Company as an engineer in charge of the research department in developing useful products from waste wood. He was then employed by Pacific Power and Light Company until 1967, and he served as a consultant on a special project which related to safety of electric hot water heaters. Defendants' objection to his qualification was:

"Well, I would on the basis of the man's testimony now object to his answering the question on

what caused this blanket or whatever the problem was with the blanket in glowing and so forth, on the ground I don't think he qualified from the electrical standpoint and I think he so indicated."

Even though the witness was a chemical engineer and not an electrical engineer, he had sufficient training, study, background, and experience to qualify as an expert witness. He does not necessarily have to be an expert in the specific item under question in a products liability case. Whether he is the best expert witness on the specific subject or what credibility will be given to the witness's testimony are matters that go to the weight of his testimony and not to his qualification. The court instructed the jury:

"* * * In determining the weight to be given to such opinion, you should consider the qualifications and credibility of the expert and the reasons given for his opinion. You are not bound by such opinion. You shall give it such weight, if any, that you feel the opinion is entitled to."

In *Highway Com. v. Parker et al,* 225 Or 143, 162, 357 P2d 548 (1960), this court stated:

"* * * [T]he competency of a witness who is called as an expert is a preliminary matter which is addressed to the sound discretion of the trial judge. Wigmore on Evidence, 3rd ed. § 561, is a vigorous proponent of the rule that the competency of the would-be expert must be left with the trial judge. He says:

" 'Secondly, and emphatically, the *trial Court must be left to determine,* absolutely and without review, the fact of possession of the required qualification by a particular witness.'

This court has not gone so far as to assign completely to the trial judge's province a ruling upon the would-be expert's qualifications, but it has gone

far in that direction: *Miller Construction Co. v. Drake Co.*, 221 Or 249, 351 P2d 41."

The court did not err in allowing the witness to testify as an expert.

Defendants next contend that even if Dr. Anderson was qualified as an expert witness, "[t]he hypothetical question which Mr. Anderson was asked relating to the probable source of the glowing 'embers' included numerous assumptions which were unsubstantiated by competent evidence * * *." The only example, from the record, of unsubstantiated assumptions is:

> " '* * * it is assumed by the person who is using it [the electric blanket] that they probably turned it off, but they are not sure.' "

In the trial of a case, one of the most troublesome problems to counsel and trial judges is the putting of a proper hypothetical question to an expert witness based on substantial evidence in the record in order to allow the expert witness to express opinions or inferences.

Much has been written on the use of the hypothetical question.[2] The writers have stated that the use of the hypothetical question in presenting expert opinion has been so grossly abused that it creates a scandal. Judge Learned Hand referred to the practice as "the most horrific and grotesque wen on the fair

---

[2] 2 Jones on Evidence (5th ed 1958) § 422; Edith L. Fisch, "Expert Opinion in New York," 18 Brooklyn L Rev 224 (1952); Charles T. McCormick, "Impressions of the Proposed Missouri Evidence Code," 17 U of Kan City L Rev 4 (1948-1949); Charles T. McCormick, "Some Observations Upon the Opinion Rule and Expert Testimony," 23 Tex L Rev 109 (1945); Ladd, "Expert and Opinion Testimony," 40 Minn L Rev 437 (1956); Ladd, "Expert Testimony," 5 Van L Rev 414 (1952).

face of justice." Lectures on Legal Topics, New York Bar Association (1921-1922).

2 Wigmore, Evidence (3d ed) 812, § 686 poses the question, *"Must the Hypothetical Question go,* as a requirement?" and states:

"Its abuses have become so obstructive and nauseous that no remedy short of extirpation will suffice. It is a logical necessity, but a practical incubus; and logic must here be sacrificed. After all, Law (in Mr. Justice Holmes' phrase) is much more than Logic. It is a strange irony that the hypothetical question, which is one of the few truly scientific features of the rules of Evidence, should have become that feature which does most to disgust men of science with the law of Evidence.

"The hypothetical question, misused by the clumsy and abused by the clever, has in practice led to intolerable obstruction of truth. In the first place, it has artificially clamped the mouth of the expert witness, so that his answer to a complex question may not express his actual opinion on the actual case. This is because the question may be so built up and contrived by counsel as to represent only a partisan conclusion. In the second place, it has tended to mislead the jury as to the purport of actual expert opinion. This is due to the same reason. In the third place, it has tended to confuse the jury, so that its employment becomes a mere waste of time and a futile obstruction.

"No partial limitation of its use seems feasible, by specific rules * * *."

■ The National Conference of Commissioners on Uniform State Laws, after four years of debate and redrafting, adopted the Uniform Act on Expert Testimony with their comment as follows:

"Rule 58. *Hypothesis for Expert Opinion Not Necessary.* Questions calling for the opinion of an

expert witness need not be hypothetical in form unless the judge in his discretion so requires, but the witness may state his opinion and reasons therefor without first specifying data on which it is based as an hypothesis or otherwise; but upon cross examination he may be required to specify such data.

## "Comment

"This rule does away with the necessity of following the practice (grossly abused) of using the hypothetical question, but does not forbid its use. It is consistent with the provisions of the Model Expert Testimony Act drafted by this Conference * * *."

An analysis of the problem and the one presented by this assignment leads us to the conclusion that "Rule 58," adopted by the National Conference of Commissioners on Uniform State Laws, is a reasonable rule of law and we adopt its language as the law in Oregon. This rule contemplates that the expert witness is acquainted with the pertinent facts of the case or has heard testimony given, or has read pertinent depositions of witnesses or has examined and considered exhibits before being called to testify. This is expressed by Wigmore, *supra* at 813 as follows:

"1. *Where an expert witness has not had personal observation of matters of fact in the case in hand, but has listened to or read any or all of the testimony or depositions to such matter of fact, he may be asked, by the party calling him, to state his conclusion, without specifying in the question the data forming the basis of the conclusion;* * * *.

"2. *Where an expert witness has considered data presented him otherwise than through the testimony or deposition of a witness in the case, he*

*may be asked to state his conclusions thereon, if qualified by personal observation or by general experience, in which case the question need not be in hypothetical form; \* \* \*.*

"3. *In either of the foregoing classes of cases, the opposite party on cross-examination may require the witness to specify the data on the hypothesis of which his conclusion was based."* (Emphasis theirs.)

The above rule does not do away with the use of the hypothetical question, but it does eliminate the necessity of following the practice.

 The record indicates that Dr. Anderson heard a large portion of testimony of other witnesses before he was called to testify and had conducted experiments with material from an electric blanket received in evidence and stipulated to have been similar to the one destroyed in the fire. Great latitude should be given counsel on the cross-examination of an expert witness and this right was accorded counsel for defendant. The facts are that the electric blanket in question was used on the bed of Olga M. Wulff, daughter of plaintiffs. She testified as follows:

"Q And do you know for sure whether or not you turned off the controls?

"A No, I don't. It was my habit to turn them off and I did it within the limitation of human fallability [sic], but I believe to have turned them off because I always tried to, but I can't be sure."

In the total context of the expert's testimony, the inclusion of the statement in the hypothetical question, "it is assumed by the person who is using it [blanket] that they probably turned it off but they are not sure," was of no consequence. It is an equivocal statement

and had no effect on the testimony given by Dr. Anderson. We find no error in this assignment.

Defendants next contend that the court "erred in refusing defendants' demand to produce attorney Houser's entire file after the witness testified to substantial elements of the case-in-chief for all plaintiffs."

Douglas G. Houser, an attorney for plaintiff Safeco Insurance Company, was called as a witness by plaintiffs Wulff to testify concerning the whereabouts and description of the second blanket purchased by the Wulffs; why the Wulffs were not included as plaintiffs when the case was first filed; to identify some photographs of the burned premises and the burned condition of the house as he observed it.

On cross-examination the following occurred:

"Q [By Mr. Banks] Where is the file that you reviewed in advance of the trial?

"A I think it is probably with Mr. Stephenson.

"Q May I see it, please?

"A I will object on behalf of myself that you are not entitled to see the entire file.

"Q All I want to see is what you reviewed?

"A It contains confidential communications to my client, and I reviewed the entire file.

"Q * * * I'd like to see what it is that you reviewed that you are basing your testimony on; * * *"

Thereafter, out of the presence of the jury, the following occured:

"THE COURT: Do you have a matter for the record?

"MR. BANKS: Well, Mr. Houser refused to produce certain portions of his file on the witness

stand on the ground of the attorney-client privilege, and I just want to state for the record that we are requesting the opportunity to review his whole file up to the time of the filing of the original complaint ✻ ✻ ✻.

"✻ ✻ ✻ ✻ ✻.

"THE COURT: Well, it wasn't the plaintiff Safeco that put Mr. Houser on the stand, as I remember it. It was the plaintiff [sic] Wulff, and I don't think that this action on the part of the individual plaintiffs acts as a waiver of any claim of privilege that Mr. Houser may have as between himself and his client, so your request, if that is what it is, for an examination of the whole file or rather that part of it which may be confidential communications between Mr. Houser and his client is denied."

There was extended colloquy between counsel, witness Houser, and the trial court during most of the time that Mr. Houser was on the witness stand. Witness Houser located his "entire file" and examined it himself and purportedly extracted therefrom all of the file that he contended was *not* privileged communication with his client, Safeco Insurance. The part of the file produced consisted of correspondence that he had with the plaintiffs, Mr. and Mrs. Charles J. Wulff, and typewritten notes pertaining to telephone conversations with Mrs. Wulff. They were marked as Exhibit "A."

"THE COURT: Now, what has been handed to me constitutes all of the items, I take it, that Mr. Houser has extracted from the file, and which have reference to the matters Mrs. [sic] Banks is concerned about, and I am going to mark this group of letters so that the record may be complete as Exhibit 'A'.

"(Thereupon DEFENDANT'S EXHIBIT 'A', a group of letters, were marked for Identification.)

"THE COURT: And the objection to Mr. Banks examining these as imposed by counsel for both plaintiffs will be overruled and Mr. Banks will be permitted to examine these documents that are Exhibit 'A'."

■ The record discloses that Exhibit "A" was given to defense counsel but it was not offered or received in evidence. No request was made to have the "entire file" marked as an exhibit. If the entire file had been marked as an exhibit, the trial court could have examined the contents of file *in camera* and ruled on the production of all or a portion of the file, *State ex rel Dooley v. Connall*, 257 Or 94, 475 P2d 582 (1970), and this court could review the matter on the record. If defendants were going to be in a position to claim the court committed *prejudicial* error, they have the obligation to make the material they were prevented from seeing part of the record so that this court could determine whether they were in fact prejudiced.

■ Defendants' next assignment of error concerns the trial court's refusal to grant defendants' motion for a mistrial "based upon plaintiffs' repeated double examination of witnesses called on behalf of all plaintiffs."

Defendants argue that "the court abused its discretion and seriously prejudiced the rights of defendants by refusing to enforce the clearly recognized principle that both parties are to be given equal opportunity to present their evidence." No cases are cited to support the defendants' contention in this regard. Defendants contend that "the practice violated the substance of such norms as Rule 6.03(1)" of the Circuit Court, Fourth Judicial District (Multnomah County), which reads as follows:

"Examination of a witness by more than *one*

*attorney for each party* or argument on questions of fact or law on objections or motions shall not be permitted, unless for good cause shown the Court in its discretion relaxes the enforcement of this Rule." (Emphasis supplied.)

We find no Oregon statute that covers the procedure objected to. ORS 1.160 provides:

"* * * [I]f the course of proceeding is not specifically pointed out by the procedural statutes, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the procedural statutes."

Absent a statute or valid rule of the trial court controlling the procedure objected to, we find the trial court did not err or abuse its discretion in allowing counsel for each party plaintiff to examine the witnesses.

Defendants' final assignment of error is that the court erred "in refusing to grant defendants' motion for mistrial which was based on the misconduct of one plaintiff, two of plaintiffs' key witnesses, and a juror."

On the morning of the third day of trial, defendants moved for the mistrial. The facts as related by counsel and the court's ruling best describe the incident.

"MR. BANKS: * * *.

"Yesterday evening when I left the courtroom and courthouse with my client's representative— we had stayed in the courtroom as did the other attorneys involved—in fact, you were still here when we left for ten minutes or so * * * we walked out of the courthouse and at the bottom of the stairs on the sidewalk right next to the wall were Mrs. Wulff and the two girls [daughters of Mrs.

Wulff]. I didn't hear what they were saying, but they were really going at it as far as talking, and right next to them as close as that chair is to me was one of the jurors standing against the wall, and the juror looked up at me as we came up the stairs with a little embarrased [sic] smile on her face.

"She was not talking to them, but she was standing right next to them and they couldn't have missed her, so we went on down the stairs, and finally I decided it had to be broken up, and I didn't figure I was in a position to talk to any of the three women, so as I turned the corner I turned around and stared at the juror until she left.

"* * * * *.

"I don't know what they were saying, but I am quite confident they knew. * * * They knew who they were standing next to and it put me in a rather embarrasing [sic] position in behalf of my client, and while I don't contend they are talking about the case, I am sure they weren't talking about anything that would have harmed their case * * *.

"MR. SWINK: When Mr. Banks brought it up before, I talked to all three women [Mrs. Wulff and her two daughters] as to what their conversations were and they state they were standing there waiting for the husband, the father, to pick them up and that they were discussing where they were going to dinner and that sort of thing, No discussion of the case at all.

"* * * * *.

"MR. BANKS: I didn't see the juror talking to them, but she was standing next to them.

"MR. SWINK: And that when they came out of the courthouse the juror did look up and nodded, of course, and she then nodded and said something about it was nice to be out in the fresh air. This was the total comment that was made. They don't specifically recall having responded to this in any way.

"THE COURT: Well, there being no evidence that there was any discussion of the case, the mere proximity of a juror to plaintiff, Mrs. Wulff and the two daughters, while they were discussing something unrelated to the case doesn't constitute grounds for a mistrial and the motion will be denied."

■ When an attorney observes any misconduct or any irregularity on the part of a juror, witness, or other counsel, the matter should be immediately brought to the attention of the trial judge. Counsel can then move or the court on its own motion can order that the parties involved be brought separately into chambers to discuss the facts and this can be made a part of the record. In the instant case, counsel for the defendants knew that the trial judge was still in his chambers. Also, there was no motion by counsel to have the trial judge individually interrogate the juror, party and witnesses involved in the incident. Counsel for the defendants stated that he "didn't hear what they were saying" and affirmatively stated "she [juror] was not talking to them [plaintiff Mrs. Wulff and her two daughters]." He also stated to the court, "I don't contend they are talking about the case."

■ Defendants argue that they "were forced to prejudice their case as to one juror by the misconduct of the plaintiff, Mrs. Wulff, and two of plaintiffs' key witnesses, the two Wulff daughters." We do not agree. The proper procedure called for the matter to have been immediately brought to the attention of the trial judge. *Transamerica Title Ins. v. Millar*, 258 Or 258, 482 P2d 163 (1971). Defendants rely upon *Goodeve v. Thompson*, 68 Or 411, 415, 136 P 670, 137 P 744 (1913), but in *Goodeve* one of the jurors was seen in close conversation with plaintiff during the

trial. Admittedly, no party, attorney of record, or anyone connected with the trial of the case, other than the bailiff, should be placed in a questionable situation with one or more of the jurors. The jurors should remain insulated from the contestants so they may truly act as impartial and unprejudiced jurors. However, in this case we cannot, on the record before us, rule that the trial court abused its discretion in denying the motion for a mistrial. *See Johnson v. Kolovos,* 224 Or 266, 355 P2d 1115 (1960); *State v. Roden,* 216 Or 369, 339 P2d 438 (1959).

Notwithstanding all of the assignments of error, some involving difficult problems of law, we are of the opinion that no reversible error was committed.

Affirmed.