359 A.2d 822

**CORNELL DRILLING COMPANY, a corporation, Appellant,**

**v.**

**FORD MOTOR COMPANY, a corporation, and Null Ford Sales, Inc., a corporation.**

Superior Court of Pennsylvania.

June 28, 1976.

130

John R. Walters, Jr., Janet N. Valentine, Thomson, Rhodes & Grigsby, Pittsburgh, for appellant.

Joseph R. Rygiel, Uniontown, Randall J. McConnell, Jr., Dickie, McCamey & Chilcote, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

JACOBS, Judge:

This appeal presents the question of whether appellant introduced sufficient evidence to have the issue of liability based on § 402A of the Restatement (Second) of Torts (1965)[1] submitted to the jury. The court below

---

1. The Pennsylvania Supreme Court in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966) adopted as the law of this Commonwealth

held that appellant's evidence was deficient and entered a compulsory nonsuit in favor of appellees at the conclusion of appellant's case. We disagree with this decision and remand for a new trial.

Appellant's complaint in trespass alleged *inter alia* the following facts: On August 12, 1968, appellant purchased from Null Ford Sales, Inc., (hereinafter referred to as "Null") a new 1968 truck manufactured by Ford Motor Company (hereinafter referred to as "Ford"); seventeen days later the Ford truck suddenly caught fire so as to damage and destroy the interior of the cab, the engine, and certain other parts of the truck; the fire resulted from a defective condition in the truck that existed at the time it was sold by Ford and also from the negligence of Ford's employees and Null's employees.[2]

After several subsequent pleadings were filed, the case proceeded to trial where the following testimony was introduced into evidence: Kenneth W. Emory testified that he was employed by appellant on the day the truck caught fire. He was one of two men who operated the truck that day. On the day in question, he and another of appellant's employees were at the site of a strip mine drilling holes in which dynamite was later to be placed. The

§ 402A of the Restatement (Second) of Torts (1965) which reads as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

2. No argument has been presented on appeal as to the propriety of the lower court's granting a nonsuit as to appellant's theory of liability based upon negligence.

truck was used to transport the drill from hole to hole. Somewhere between the tenth and fifteenth holes that were drilled that day the drill broke. Emory and his partner then decided to leave the area and travel to town in a pickup truck (not the Ford) to obtain the part needed to fix the drill. Emory testified that when they left the area the truck engine was turned off, its doors were closed, the windows were up, there was no one else in the area, and there was no evidence of any fire at that time. Approximately one hour after they were gone, they received word over their two-way radio that the Ford truck was on fire back at the mine. When they returned, Emory noticed that the Ford truck was in the same position as it had been when they left and the doors were still closed. However, the cab of the truck was burned to such an extent that the glass had melted. Emory did not have occasion to examine under the hood of the truck to determine the extent of the fire in that area. However, Emory did notice that certain jumper cables kept behind the seat in the cab had not come in contact with a reserve battery that was kept on the floor board in the cab and was still covered. Emory's testimony also made it clear that the Ford truck had been functioning properly prior to the fire.

Wayne Layhue, Emory's working partner, was the next witness to testify for appellant. His testimony reaffirmed the fact that the truck had been operating normally that morning and that there was no evidence of any fire when he and Emory departed for town. According to Layhue, the truck had been turned off a half hour before they had left for the parts. Layhue substantially made the same observations testified to by Emory. Layhue also added that he did not do anything to cause the fire.

J. R. Cornell, owner of appellant corporation, testified that he had purchased the Ford truck new from Null and that it had only 35 miles on its odometer when it caught fire. He agree with the two prior witnesses that there

had been no trouble with the truck up to the time it caught fire. According to Cornell, nothing had been altered on the truck by appellant although Null had extended the truck's chassis several inches prior to delivering it to appellant. Cornell testified that the interior of the cab had been burnt more severely than the area under the hood. Cornell admitted that he did not know the cause of the fire.

The final witness, Norman Sharp, the service manager of Null, was called by appellant. Because appellant failed to list Sharp as an expert in its pre-trial statement, the court refused to permit Sharp to give his opinion that the electrical system on this type of truck was insufficiently fused. However, Sharp was allowed to testify that he could not determine the cause of the fire becaus "everything was burnt beyond the possibility of the identification of it." Notes of Testimony at 69–70. Sharp further testified that there was no evidence of any fire in the rear area of the truck but that the fire basically was confined to the area of the cab and under the hood. According to Sharp, no one at Null ever checked the fuses in the truck's electrical system and he did not know if the proper fuses were at the proper circuits on the truck. Sharp also noted that after the fire the fuse box in the truck was completely destroyed.

To eliminate the necessity of appellant's calling another witness the parties stipulated that, if called, Ford's expert, a Mr. McDonald, would testify that "there was no evidence of an external cause for the fire, that there was no evidence that the drilling rig . . . caused the fire, that there is no evidence that the extension of the chassis . . . caused the fire, and that there is no evidence that the battery terminals or the cables which are attached to the battery terminals . . . caused the fire." Notes of Testimony at 79.

Appellant then rested on the issue of liability. The court entertained Ford's and Null's motion for a com-

pulsory nonsuit and after argument granted it. The court en banc affirmed the trial judge's order granting the nonsuit. The basis for the lower court's decision was that appellant had failed to prove a defective condition unreasonably dangerous to the user or consumer or its property as required by § 402A of the Restatement (Second) of Torts (1965). The court found that appellant's evidence only established a fire in a truck that was not in operation. "[H]ad the truck caught fire for unexplained reasons while it was in operation," reasoned the lower court, "evidence of a malfunction [might have been] presented." Printed Record at 119a. But because there was no evidence of a specific defect nor evidence of a malfunction during the normal operation of the truck, the court below found that the jury would be forced to speculate over the cause of the fire from the almost limitless range of possibilities that existed.

"On appeal from a compulsory nonsuit the plaintiff must be given the benefit of every fact and every reasonable inference of fact arising from the evidence, whether direct or circumstantial, and all conflicts must be resolved in the plaintiff's favor. A compulsory nonsuit may be entered only in a clear case where the facts and circumstances lead unerringly to but one conclusion." *Paul v. Hess Bros.*, 226 Pa.Super. 92, 94–95, 312 A.2d 65, 66 (1973) (citations omitted). In a trespass case, a plaintiff need not exclude every other reasonable possibility that could have caused the accident. "It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability." *Jones v. Treegoob*, 433 Pa. 225, 230, 249 A.2d 352, 355 (1969).

As correctly observed by the lower court, for appellant to submit his case to the jury on the theory of strict liability under § 402A of the Restatement (Second)

of Torts (1965), it was necessary to "prove that the product was defective, and . . . that the defect was a proximate cause of the plaintiff's injuries." *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 93, 337 A.2d 893, 898 (1975). What is a defective product? According to comment (g) of § 402A a defective condition exists when "the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Dean Prosser has noted that "[t]he prevailing interpretation of 'defective' is that the product does not meet the reasonable expectations of the ordinary consumer as to its safety." W. Prosser, *Law of Torts*, 659 (4th ed. 1971) (footnote omitted). Another definition is that "a product is defective if it fails to match the average quality of like products." Traynor, *"The Ways and Meanings of Defective Products and Strict Liability,"* 32 Tenn.L.Rev. 363 (1965).

■ Although it is helpful for a plaintiff to have direct evidence of the defective condition which caused the injury or expert testimony to point to that specific defect, such evidence is *not* essential in a strict liability case based on § 402A. *See Bialek v. Pittsburgh Brewing Co.*, 430 Pa. 176, 242 A.2d 231 (1968); *MacDougall v. Ford Motor Co.*, 214 Pa.Super. 384, 257 A.2d 676, *allocatur refused*, 214 Pa.Super. *xl* (1969). In *Bialek* our Supreme Court stated that lay testimony demonstrating that a beer bottle exploded spontaneously when it was picked up by plaintiff was sufficient without expert testimony to present a jury question of liability. Similarly, in *MacDougall* our Court indicated that plaintiff's testimony that her car failed to handle properly was sufficient without expert testimony to permit the liability question to go to the jury. "[P]roof of specific steering defects was not a prerequisite to establishing liability . . . ." *Id*. 214 Pa.Super. at 391, 257 A.2d at 680.

Accordingly, a plaintiff may often rely on circumstantial evidence, and the inferences that may reasonably be drawn therefrom, to prove his case. Although the mere happening of an accident does not establish liability, *Berry v. Lintner*, 226 Pa.Super. 562, 323 A.2d 253 (1974), Dean Prosser has observed that "the addition of other facts tending to show that the defect existed before the accident, such as its occurrence within a short time after sale, or proof of the malfunction of a part for which the manufacturer alone could be responsible, may make out a sufficient case . . . So likewise may proof that other similar products made by the defendant met with similar misfortunes, or the elimination of other likely causes by satisfactory evidence. In addition, there are some accidents, as where a beverage bottle explodes or even breaks under normal handling, as to which there is common experience that they do not ordinarily occur without a defect; and this permits the inference." W. Prosser, supra at 673–74. This Court in *MacDougall v. Ford Motor Co.*, supra, held that "the occurrence of a malfunction of machinery in the absence of abnormal use and reasonable secondary causes is evidence of a 'defective condition' within the meaning of § 402A . . ." *Id.* 214 Pa.Super. at 391, 257 A.2d at 680. After *MacDougall*, Pennsylvania courts have been consistent in holding that the malfunctioning of a product is circumstantial evidence of a defective condition in spite of the lack of evidence of any specific defect in the product. *Agostino v. Rockwell Mfg. Co.*, 236 Pa.Super. 434, 345 A.2d 735 (1975) ; *D'Antona v. Hampton Grinding Wheel Co.*, 225 Pa.Super. 120, 310 A.2d 307, *allocatur refused*, 225 Pa.Super. *xlii* (1973) ; *Spann v. Francis-Fords, Inc.*, 56 Pa.D.C.2d 519 (Dauph.1972).

The court below considered *MacDougall* and its progeny but found those cases inapplicable because the Ford truck was not in operation at the time of the fire and therefore no "malfunction" occurred. Because no spe-

cific defect was established by appellant, a nonsuit was entered. We cannot agree with this treatment of the case by the lower court.

The definition of "malfunction" lends support to the decision of the lower court. "Malfunction" has been defined as "to function badly or imperfectly: fail to operate in the normal or usual manner." Webster's Third New International Dictionary 1367 (1963). Because the Ford truck was not in operation when it was observed to be on fire, it would semantically be incorrect to say that it was malfunctioning at that time. However, is a manufacturer to escape liability under all circumstances when a product not in use catches on fire and the injured party is unable to point to the specific defect causing the fire?

A review of current case law reveals that it is quite common for fires to occur in motor vehicles while they are in operation. *Wear v. Chenault Motor Co.*, 52 Ala. App. 382, 293 So.2d 298 (1974); *Guardian Ins. Co. v. Onacostia Chrysler-Plymouth, Inc.*, 320 A.2d 315 (D.C. App.1974); *Jacobson v. Broadway Motors, Inc.*, 430 S.W. 2d 602 (Mo.App.1968); *Haugen v. Ford Motor Co.*, 219 N.W.2d 462 (N.D.1974); *Spann v. Francis-Fords, Inc.*, supra. Also, it is not uncommon for a fire to suddenly break out in a motor vehicle even though the ignition had been turned off and it was not being operated. *Gherna v. Ford Motor Co.*, 246 Cal.App.2d 639, 55 Cal.Rptr. 94 (1966); *Ford Motor Co. v. Pittman*, 227 So.2d 246 (Fla. App.1969), *cert. denied* 237 So.2d 177 (Fla.1970); *Hall v. Everett Motors, Inc.*, 340 Mass. 430, 165 N.E.2d 107 (1960); *Bass v. General Motors Corp.*, 447 S.W.2d 443 (Tex.Civ.App.1968); *Vernon v. Lake Motors*, 26 Utah 2d 269, 488 P.2d 302 (1971). Other cases demonstrate that a fire or some other irregularity may occur in different types of products although they have been turned off and have not been interfered with by any human agency.

*Grant v. National Acme Co.,* 351 F.Supp. 972 (W.D.Mich. 1972) (industrial machine); *Wulff v. Sprouse-Reitz Co.,* 262 Or. 293, 498 P.2d 766 (1972) (electric blanket); *Bombardi v. Pochel's Appliance and T. V. Co.,* 9 Wash. App. 797, 515 P.2d 540, *modified,* 10 Wash.App. 243, 518 P.2d 202 (1973) (television set). The complicated electrical wiring systems found in automobiles, trucks, televisions, appliances, and countless other products present in our society always pose a threat of fire. As demonstrated by the above cases, it is not unusual for a product to catch fire or act in some other abnormal way even though it is not being used. Yet according to the lower court, where a product not in use suddenly catches fire, the manufacturer is not liable unless a specific defect can be established. Hence, when a product as in the present case totally consumes itself by its flames to the extent that its parts are no longer identifiable a manufacturer could not be held liable.

We refuse to adopt the superficial distinction that proof of a malfunction is the only circumstantial evidence available from which a "defective condition" in a product can be inferred. Were we to do so we would be committing the same practice condemned by the Supreme Court in *Gilbert v. Korvette's Inc.,* 457 Pa. 602, 327 A.2d 94 (1974). In *Gilbert* our Supreme Court observed that the doctrine of "res ipsa loquitur," originally conceived as a "shorthand statement of the evidentiary rule allowing negligence to be established by circumstantial proof." *Id.* at 605, 327 A.2d at 96–97, had evolved into a "labyrinth of formal distinctions." *Id.* at 609, 327 A.2d 99. By adopting § 328D of the Restatement (Second) of Torts (1965), the Supreme Court simplified the law in the area and returned to the basic concept that some inferences are permissible after the presentment of certain circumstantial evidence. *Id.* In the present case, we also must avoid becoming overburdened by formal distinctions. We must look beyond the distinctions and

apply the principles upon which the distinctions were based.

Evidence of a malfunction is but one piece of circumstantial evidence that can be used to elicit the inference that a product was in a "defective condition." " '[A] defect can be inferred from unexplained occurrences' and need not be directly proved." *D'Antona v. Hampton Grinding Wheel Co.*, supra, 225 Pa.Super. at 123 n. 4, 310 A.2d at 309 n. 4. As previously noted by Dean Prosser other circumstantial evidence [(1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect] may permit the inference that the product was defective. W. Prosser, supra at 673–74.

Various cases have demonstrated that from certain circumstantial evidence it may be inferred that the product was defective. In *Bialek v. Pittsburgh Brewing Co.*, supra, a beer bottle exploded spontaneonsly as it was being handled. Although this was not a "malfunction" type case and there was no proof of a specific defect, the Supreme Court observed that the testimony that the bottle exploded was sufficient to make the issue of liability a jury question. *Id. Bombardi v. Pochel's Appliance and T. V. Co.*, supra, presents a case where a television set that was not being used caught fire in the middle of the night. Again the product was not in use so technically a "malfunction" did not occur and it was impossible for the plaintiff to show a defect by direct evidence because the television had been totally destroyed by the fire. Nevertheless, the Court permitted plaintiffs to establish a defective condition by circumstantial evidence. Although some of this evidence consisted of expert testimony as to "possible" defective components that rendered the television fire prone and testimony as to the care

of the television by plaintiffs, the Court also noted that "there are some accidents as to which there is common experience dictating that they do not ordinarily occur without a defect, and as to which the inference that a product is defective should be permitted." *Id.*, 10 Wash. App. at 246, 518 P.2d at 204. Similarly in *Gherna v. Ford Motor Co.*, supra, the Court in finding a basis for liability through the doctrine of "res ipsa loquitur" stated: "We think it is a matter of common knowledge that new automobiles which have been properly driven for only about 1,600 miles do not suddenly develop a fire in the engine compartment without someone's negligence." *Id.* 55 Cal.Rptr. at 99.

We must now review the circumstantial evidence presented by appellant to determine whether it was sufficient to permit the inference that the Ford truck was in a defective condition when it left the manufacturer. First, there was testimony that the parts in the truck were burnt beyond the possibility of identification so that Null's service manager was unable to determine the cause of the fire. However, the service manager did testify that no one at Null checked the fuses or determined whether they were in their proper locations. Second, the owner of appellant corporation testified that the fire occurred in the truck soon after it was purchased and it had been driven only 35 miles. Third, appellant's other witnesses testified that they did not cause the fire and did not observe anything to lead them to believe that someone else caused the fire and Ford and Null stipulated that "there was no evidence of an external cause for the fire . . . ." Notes of Testimony at 79. It should also be noted that the physical evidence indicated that the fire originated in the cab and engine areas of the truck. Lastly, we find as did the Court in *Bombardi* that this is not the type of accident (under the facts of this case) that would occur without some type of defective condition in the truck.

142

We are unable to conclude that the facts presented by appellant point unerringly to the sole conclusion of non-liability. Taking appellant's evidence in its most favorable light, we are of the opinion that a reasonable jury could have inferred from the facts and circumstances that the Ford truck was in a defective condition at the time it left Ford's control.

Order reversed and case remanded for a new trial.