Edward J. OLSEN, Jr., an Incompetent by Margaret A. Olsen, his Guardian, and Margaret A. Olsen in her own right

v.

The UNITED STATES of America

v.

FORD MOTOR COMPANY.

Civ. A. Nos. 79–3262, 80–1546.

United States District Court, E. D. Pennsylvania.

Oct. 19, 1981.

Joseph D. Shein, Philadelphia, Pa., for plaintiff.

Peter F. Vaira, U. S. Atty., James G. Sheehan, Asst. U. S. Atty., Philadelphia, Pa., for United States of America.

Joseph V. Pinto, Philadelphia, Pa., for defendant Ford Motor Co.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the Court is plaintiffs' motion for a new trial in a personal injury action, brought in the name of plaintiff Edward Olsen ("Olsen"), an incompetent, by his wife as guardian, and by his wife in her own right, to recover damages from defendant Ford Motor Company ("Ford") for the injuries Olsen suffered in an automobile accident in 1977. After ten days of trial, the jury returned a verdict in Ford's favor. After full consideration of plaintiffs' arguments, the Court has concluded that plaintiff is not entitled to a new trial. Accordingly, the plaintiffs' motion will be denied.

### I. *Statement of the Case*

The accident occurred in the early morning of September 10, 1977. Olsen was seated in the front passenger seat of the car in question (a 1972 Pinto), in which he was traveling with three friends. The owner of the car, Dr. Timothy Cooper ("Cooper"), was driving. At the time of the accident, the car was traveling at about 50 to 70 miles per hour on a dry, two-lane highway. There was little traffic. An animal suddenly ran in front of the car and Cooper veered the car to the left to avoid it. He immediately turned the car back to the right to return to his lane, but upon doing so, the car "tripped" and began to roll over to the left—that is, driver's side first. The car rolled one-and-a-half times and came to rest on its roof.

Two of the three occupants, other than Olsen, suffered minor injuries; the third suffered a broken neck, from which he later recovered. Olsen was found lying on the pavement two to twelve feet outside the car on the passenger side, bleeding from the head. The accident left him triplegic and incompetent, with the mental capacity of a ten-year-old.

The roof of the Pinto was found crushed in the area of the right front (passenger's side) A-pillar, one of the two posts supporting the forward end of the roof. Plaintiffs contended that Olsen was injured when, in the course of the roll-over, the A-pillar gave way and allowed the roof to strike Olsen's head. It was plaintiffs' contention that the right front A-pillar had been defectively and negligently designed so as to be insufficiently strong, thus rendering Ford liable on principles of either strict products liability or negligence. Plaintiffs also argued that a weld at the base of the right front A-pillar had been defectively and negligently manufactured, and gave way during the roll-over. Defendant denied that the Pinto had been improperly designed and manufactured. In addition, defendant argued that Olsen had been thrown from the car at the beginning of the roll-over process and thus could not have been injured by the Pinto's roof, even if it had been defectively or negligently designed or manufactured.

The jury delivered their verdict in answer to special interrogatories on each of the two legal theories, strict liability and negligence. The jury was first asked to state whether the Pinto had been defective and, if so, whether the defect had been the proximate cause of Olsen's injuries. Similarly, the jury was then asked whether Ford had acted negligently in the design or manufacture of the Pinto and, if so, whether Ford's negligence had been the proximate cause of Olsen's injuries. The jury found that the Pinto had not been defective and that Ford had not been negligent. Thus, the jury did not have to decide whether a defect or

negligence proximately caused Olsen's injuries.

With this brief background, the Court will now address the contentions raised by the plaintiffs.

## II. *Plaintiffs' Grounds for New Trial*

### A. Crashworthiness/Second Collision

Plaintiffs first argue that the court failed to give the jury an adequate charge on plaintiffs' "crashworthiness" and "second collision" theories. In particular, plaintiffs state that the Court merely gave "a straight negligence and 402A charge." In plaintiffs' view, such a charge fails to inform the jury of the applicable law.

■ In examining the charge for alleged error, it is necessary to view the charge as a whole. *Ely v. Reading Co.*, 424 F.2d 758, 760 (3d Cir. 1970). Moreover, "[a] party has no vested interest in any particular form of instructions; the language of the charge is for the trial court to determine. If, from the entire charge, it appears that the jury has been fairly and adequately instructed, . . . then the requirements of the law are satisfied." *James v. Continental Insurance Co.*, 424 F.2d 1064, 1065 (3d Cir. 1970), *quoted in Shaw v. Lauritzen*, 428 F.2d 247, 251 (3d Cir. 1970).

■ Turning to the case at bar, we first note that any failure to charge on so-called "crashworthiness" or "second collision" principles on the 402A phase of the case cannot be asserted to be the result of the Court's failure to heed plaintiffs' objections. Before charging the jury, the Court specifically asked plaintiffs' counsel which of his points for charge were submitted on the 402A theory and which were submitted on the negligence theory. N.T. 9–61. Plaintiffs' counsel thereafter stated three times that points 1–28, which included the points at issue here, were submitted to cover the *negligence* claim, while points 29 *et seq.* were submitted to cover the strict liability claim. *See* N.T. 9–61; 9–62; 9–67 to 9–68; 9–94; 10–6 to 10–7.

■ Plaintiffs also appear to suggest that the "second collision" doctrine has developed into a cause of action distinguishable from negligence and strict products liability. *See* [Memorandum in Support of] Plaintiffs' Motion for a New Trial, at 7. Thus, plaintiffs seem to argue, a court cannot simply rely on principles of negligence and strict products liability where the "second collision" doctrine is involved. Plaintiffs, however, offer no support for their argument. This is understandable because it is clear that "crashworthiness" and "second collision" are merely alternative expressions for the notion that, within limits, automobile manufacturers may be held liable for injuries caused by their failure to take the possibility of automobile accidents into consideration in designing their products. *See Dyson v. General Motors Corp.*, 298 F.Supp. 1064, 1072–1073 (E.D.Pa.1969). As explained below, that concept is applicable to cases tried on theories of both strict products liability and negligence. It does not, however, have a life of its own as a separate and distinct cause of action.

The Court will assume, however, that plaintiffs' contention is that the Court's charge on strict products liability and negligence was inadequate because of the lack of more specific references to "crashworthiness" and "second collision." These terms are no doubt useful tools, as all words are, to guide courts, lawyers and juries in understanding more elaborate principles. Terms such as these, however, may be more attractive because of their brevity than they are useful from the viewpoint of comprehension. It is plainly preferable to concentrate on clearly explaining the relevant principles than to use shorthand expressions of uncertain or even incorrect meaning.

The so-called "crashworthiness" and "second collision" doctrines have generally come into play in personal injury actions arising out of automobile accidents in which it is alleged that the design or construction of the vehicle did not cause the accident itself, but instead caused injury in the course of an accident resulting from some other cause. *See generally* 1 *L. Frumer &*

*M. Friedman, Products Liability* § 6.05[14][a] (1981). A split of authority has developed over whether an automobile manufacturer may ever be held liable for injuries suffered in an accident where the accident itself was not caused by a defect in the automobile. *E. g. Evans v. General Motors Corp.*, 359 F.2d 822 (7th Cir. 1966) (manufacturer could *not* be held liable). *Contra Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968) (manufacturer may be liable). The rationale of those cases in which the manufacturer has been absolved from liability is that a manufacturer has a duty to make a product reasonably fit for its intended purpose, and "the intended purpose of an automobile does not include its participation in collisions with other objects, despite the manufacturer's ability to foresee the possibility that such collisions may occur." *Evans v. General Motors Corp., supra*, at 825. The cases reaching the opposite result criticize this view as narrow and unrealistic. *E. g. Larsen v. General Motors Corp., supra*, at 502. Their view, as fully explained in the leading case taking this position, *Larsen v. General Motors Corp., supra*, is as follows:

> Where the manufacturer's negligence in design causes an unreasonable risk to be imposed upon the user of its products, the manufacturer should be liable for the injury caused by its failure to exercise reasonable care in the design. These injuries are readily foreseeable as an incident to the normal and expected use of an automobile. While automobiles are not made for the purpose of colliding with each other, a frequent and inevitable contingency of normal automobile use will result in collisions and injury-producing impacts. No rational basis exists for limiting recovery to situations where the defect in design or manufacture was the causative factor of the accident, as the accident and the resulting injury, usually caused by the so-called "second collision" of the passenger with the interior part of the automobile, all are foreseeable. Where the injuries or enhanced injuries are due to the manufacturer's failure to use reasonable care to avoid subjecting the user of its products to an unreasonable risk of injury, general negligence principles should be applicable. The sole function of an automobile is not just to provide a means of transportation, it is to provide a means of safe transportation or as safe as is reasonably possible under the present state of the art.

*Id.* at 502 (footnote omitted).

The Pennsylvania appellate courts have not decided this issue. Two Federal Courts, however, applying Pennsylvania law, have predicted that Pennsylvania will adopt the broader view represented by *Larsen*. *Jeng v. Witters*, 452 F.Supp. 1349, 1355 (M.D.Pa. 1978), *aff'd*, 591 F.2d 1334, 1335 (3d Cir. 1979); *Dyson v. General Motors Corp.*, 298 F.Supp. 1064, 1072–1073 (E.D.Pa.1969). There being no reason to depart from the holdings of these cases, the Court charged accordingly.

 It should be plain from the language quoted above, however, that there is nothing obscure about the point that divides the authorities in these cases. In plain English, the question is whether an automobile manufacturer must take into consideration in the design and manufacture of its product the possibility that the product may be involved in an accident not of its own making. Pennsylvania law, as predicted by the Federal Courts, dictates that it must. *Jeng v. Witters, supra*, at 1355; *Dyson v. General Motors Corp., supra*, at 1072–1073. This duty is not without limits, of course, but is circumscribed by the usual principles of negligence and strict products liability. *See Larsen v. General Motors Corp., supra* (applying negligence); *Jeng v. Witters, supra* (applying principles of strict products liability); *Bowman v. General Motors Corp.*, 427 F.Supp. 234 (E.D.Pa.1977) (same); *Dyson v. General Motors Corp., supra* (applying both negligence and strict products liability principles). The concept which principally distinguishes so-called "crashworthiness" or "second collision" cases is that the manufacturer's liability is not artificially cut off simply because the manufacturer

did not intend that its product be involved in a collision. Therefore, the plaintiff suffered no prejudice as long as the charge, when considered in light of the circumstances of the case and the manner in which it was tried, instructed the jury on the principles of strict products liability and negligence in such a form that the jury would have no difficulty applying those principles even where the defect or negligence did not cause the accident itself, but caused injuries in the course of an accident resulting from other causes. Accordingly, in reviewing the charge at issue, it must necessarily be acknowledged that neither the parties nor, consequently the Court, presented the case to the jury in a way suggesting that the manufacturer could escape liability if the defect or negligence did not cause the accident itself.

Another factor which bore on the Court's decision to charge as it did is the current state of Pennsylvania products liability law. In *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978), the Supreme Court of Pennsylvania held that it was improper to include the phrase "unreasonably dangerous" in a jury charge in a strict products liability case. The Court's opinion focused on the danger of improperly injecting "considerations which are usually identified with the law of negligence" into a strict liability case. 391 A.2d at 1025. *See also Holloway v. J. B. Systems Limited*, 609 F.2d 1069, 1073 (3d Cir. 1979). Plaintiffs' proposed points for charge at issue here, which quoted *Dyson v. General Motors Corp., supra*, define the manufacturer's obligation as a duty to provide passengers "a *reasonably* safe container within which to make the journey." Edward Olsen Points for Charge 2, Docket No. 112 (emphasis added), *quoting Dyson v. General Motors Corp., supra*, at 1073. This definition, formulated prior to *Azzarello*, clearly cannot survive that decision for use in a charge on strict products liability.

*Azzarello*, however, does not prohibit the use of such a definition in a negligence case. Nevertheless, where, as here,

the case is tried on theories of both strict liability and negligence, there is always the danger that, if not carefully instructed, a jury will confuse the two theories and borrow concepts from one for use in considering the other. This danger is clearly present here. The submitted points for charge state that the automobile manufacturer has an obligation to provide the passenger "a *reasonably safe container* within which to make the journey." Edward Olsen Points for Charge 2, Docket No. 112 (emphasis added), *quoting Dyson v. General Motors Corp., supra*, at 1073. At best, when used in a negligence charge, the proposed instruction explains the manufacturer's duty of care only by inference. The manufacturer's duty to exercise due care in its conduct in the design and manufacture of an automobile must be inferred from the instructions' statement that the manufacturer must provide a "reasonably safe container." Thus, the instruction attempts to explain the manufacturer's duty of care in terms of the nature of the *product* which should result, rather than in terms of the *conduct* which should be engaged in to produce it. In so focusing on the nature of the end-product rather than the character of defendant's conduct, the proposed instruction is more characteristic of a charge on strict liability than a charge on negligence. Such a charge invites the jury to borrow the charge for use in dealing with a products liability claim, thus resulting in the improper infusion of negligence principles into the jury's consideration of the strict liability claim.

Even if it is assumed, however, that a jury so instructed would succeed in confining their use of the points at issue to their deliberations on a negligence claim, another danger arises. For purposes of this argument, we assume that the jury so instructed would understand that the manufacturer's obligation to consider the possibility of accidents in designing and manufacturing an automobile exists under negligence principles. Plaintiffs, however, submitted no corresponding point for charge which would explain that the manufacturer

must do likewise under strict liability principles. Left without guidance, the jury would be forced to guess whether or not a manufacturer would be held liable for plaintiffs' injuries where the asserted defect did not cause the accident. Any verdict would be the product of sheer speculation.[1]

■ Both of these criticisms give the plaintiffs the benefit of the doubt in assuming that the points for charge submitted would be valid if used in a case tried solely on a theory of negligence. Upon close examination of the charge, even this assumption proves false. It is hornbook law that negligence consists of (1) "[a] duty, or obligation, recognized by law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks," and (2) "[a] failure on his part to conform to the standard required." *W. Prosser, The Law of Torts* § 30, at 143 (4th ed. 1971). In other words, negligence "is simply one kind of conduct." *Id.* It follows that a proper charge stating for the jury the elements of *negligence* should be framed in terms of the actor's *conduct.* Further, Pennsylvania negligence law requires a manufacturer "to *exercise reasonable care in the manufacture of a chattel* which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use." *Restatement of Torts* § 395 (1934), *quoted in Mannsz v. Macwhyte Co.,* 155 F.2d 445, 450 (3d Cir. 1946) (emphasis added). *See also Restatement (Second) of Torts* § 395 (1965). The submitted points for charge merely define the condition of the manufacturer's product which may re-

sult if the actor—here the automobile manufacturer—conforms to the required standard of conduct: a "reasonably safe container." The points for charge say nothing, however, about the standard of care which the manufacturer must exercise in making that product. Conceivably, a manufacturer could exercise *no* care in producing an automobile and, by sheer good fortune, produce a "reasonably safe container." Since the proposed charge does not accurately define the manufacturer's duty of care, it is unfit for incorporation in a standard charge on negligence. The plaintiffs cannot complain of the Court's refusal to accept such a charge.

After reviewing the charge in light of these principles and considerations, the Court is convinced that plaintiffs are not entitled to a new trial on this ground.

## B. Evidence on State of the Art

■ Plaintiffs' brief in support of their motion for new trial broadly alleges that the Court erred in admitting articles into evidence on the state of the art. Plaintiffs fail to specify, however, which articles the Court erred in admitting, nor do they give references to where in the over two dozen volumes of trial and deposition transcript the errors claimed to have been made are found. In addition, plaintiffs' motion fails to cite any authority in support of its motion which might directly or indirectly assist the Court in determining the nature of the alleged errors. The Court is not obligated nor can it be expected to search through two weeks of trial transcripts to discover what could be the object of plaintiffs' motion. The requirement of Fed.R. Civ.P. 7(b) that motions "state with particularity the grounds therefor" was included to prevent the imposition of such burdens on

---

1. The Court does not mean to suggest that plaintiffs' failure to propose adequate instructions on a particular point of law necessarily discharged the Court of any obligation to charge on that point. If the jury must be instructed on a particular point of law in order to reach a proper verdict, and that point of law has not been accurately embodied in the points for charge submitted by the parties, the Court has the duty to devise its own instructions. In this case, however, the charge given was adequate under the circumstances without the plaintiffs' proposed points for charge. Since, in addition, the plaintiffs' proposed instructions were misleading or confusing as submitted, as explained above, the Court chose to reject them entirely rather than to adopt, correct and supplement them.

the Court. However, to the extent the plaintiffs' objections reach matters referred to in defendant's brief, the Court will deny plaintiffs' motion for the same reasons advanced in support of its rulings at trial. See N.T. 6–71 to 6–75 (re films of roll-over tests); N.T. 7–86 to 7–87 (re proposed federal standard); N.T. 9–138 to 9–141 (re D–49). To the extent that the plaintiffs allege other errors, the motion will be denied for lack of the specificity required by Rule 7(b).

■ One point raised in plaintiffs' motion for new trial, but not addressed in their subsequently filed brief, deserves special mention. At trial, plaintiffs strenuously objected to the admission of evidence that, at the time the accident vehicle was built, Ford conducted tests of roof strength conforming to the procedure prescribed by a proposed Federal regulation. The regulation was later adopted. Plaintiffs relied primarily on the decision of the Supreme Court of Texas in *Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex.1979), a case involving the introduction of evidence of the same proposed regulation in a crashworthiness case. In opposition, defendants relied on *Stonehocker v. General Motors Corp.*, 587 F.2d 151 (4th Cir. 1978), in which the Court held that it was error to exclude evidence of compliance with the same proposed regulation, also in a crashworthiness case. Read closely, however, the two decisions are not inconsistent in a manner material to the case before us and, consequently, support the admission of the evidence here.

In *Turner*, the trial court allowed the manufacturer to introduce evidence that it complied with the testing procedure, but required the manufacturer to refer to it as an "industry practice" and prohibited the manufacturer from showing that the "practice" later became a Federal regulation. On appeal, the Texas intermediate appellate court reversed, in part on the ground that the manufacturer was entitled to produce such evidence for the jury's assessment. See *General Motors Corp. v. Turner,* 567 S.W.2d 812, 818–820 (Tex.Ct.Civ.App.1978), rev'd, 584 S.W.2d 844 (Tex.1979). The Supreme Court of Texas reversed again, reinstating the judgment in plaintiff's favor. 584 S.W.2d at 853. The Court did say that "[a]s a rule, post-event regulations are inadmissible." *Id.* at 852. The Court went on to say, however, that "[a]part from this, we have determined from an examination of the record that the exclusion of the subsequent federal standard was not reasonably calculated to cause and probably did not cause the rendition of an improper verdict." *Id.* The Court noted that the trial court had admitted extensive evidence of the standard's development by the industry and independent laboratories, and of its recommendation by a recognized body of automotive engineers. *Id.* at 852–853. The Court then stated that "[w]e do not believe it reasonable to conclude that the verdict of the jury would have been different had proof been allowed of the additional fact that the industry-wide practice had been subsequently adopted by federal agencies as a standard for automobile roof strength." *Id.* at 853. In short, the Court concluded that the error, if any, was harmless. The Court's efforts to explain away the omission of the standard's subsequent adoption as a Federal regulation suggest that its statement that evidence of post-event regulations are *generally* inadmissible was not considered to be controlling in that case.

The *Stonehocker* court, however, plainly held that such evidence is admissible as relevant evidence of trade custom or usage. See 587 F.2d at 157. The Court agrees. If a manufacturer learns that a regulation has been proposed which, if adopted, would *require* a manufacturer to conduct a certain test on his products, and the manufacturer begins to conduct such tests before that test is required by the formal adoption of the regulation, the manufacturer's conduct certainly tends to prove that the manufacturer is exercising due care in the manufacture of his products. For example, a jury might properly infer from such evidence that the manufacturer adopted the test before it became required by regulation because those who proposed it believed the test would assist the manufacturer in determin-

ing the safety level of its product. Of course, such evidence would not be conclusive. The plaintiff might show that a reasonable manufacturer would have known the test to be inadequate and would have conducted additional tests. Nevertheless, it is relevant evidence that the jury should be allowed to consider. Thus, the Court finds no error in its admission of evidence of Ford's compliance with the proposed Federal regulation.

### C. Charge on Testing

■ Plaintiffs' third major assignment of error in their brief in support of their motion for new trial is that the Court failed to instruct the jury that defendant had a "duty to test." *Plaintiffs' Brief* at 18. On this point, the Court charged as follows:

> The plaintiff contends that Ford Motor Company was negligent, that is, it failed to use due care under all the circumstances when it designed the roof for this Pinto and/or when it placed the welds in the manufacturing process. Negligence sometimes is defined as the lack of due care or lack of reasonable care under all the circumstances and the lack of care in this instance is and has been related by plaintiff to the design and the construction *including testing* of the material involved and the components involved in the design of this car.

N.T. 10–72 to 10–73 (emphasis added).

The Court obviously did not read verbatim the language proposed by plaintiffs in the points for charge. It is now, as it was throughout the trial, quite plain to the Court that the extensive evidence of the testing procedures adopted or not adopted by the defendant had been fully and forcefully presented to the jury. The Court, therefore, believed that no further instruction was needed to remind the jury of the evidence offered concerning testing or to specifically emphasize or repeatedly explain that the defendant was required to exercise due care in testing its products. Thus, plaintiffs' motion for a new trial will not be granted on this ground.

### D. Deposition of Roger Holley

■ Plaintiffs contend that it was error for the Court to exclude from the evidence a portion of the deposition of Roger Holley, the first person to arrive at the scene of the accident. The Court heard arguments of counsel on this point at the trial and rendered its reasons and its ruling at length. *See* N.T. 5–14 to 5–19. Believing that to be correct and finding no reason to elaborate on that explanation, the Court stands on that ruling here.

### E. Rebuttal Testimony of Mr. John Marcosky

■ The next contention raised by plaintiffs in support of their new trial motion is that the Court erred in excluding the rebuttal testimony of their expert witness, Mr. John Marcosky, regarding the extent of the elastic deformation of the roof. Mr. Marcosky testified in plaintiffs' case-in-chief via videotape deposition. In the course of that deposition, he made several references to "plastic" and "elastic" deformation. *See* Marcosky Deposition 15, 31–32, 177, 181, 202–204. A fair understanding of that testimony is that "plastic" deformation is the deformation which occurs during the accident and remains thereafter, while "elastic" deformation is the amount of additional deformation which occurs only during the accident but is lost thereafter when the metal springs back toward its original position. In his deposition, Mr. Marcosky could not say how much of either type of deformation had occurred in the roof of the Pinto involved in the accident. *See id.* at 202–204. Plaintiffs did not produce testimony on this point from any other witness during their case-in-chief. Thus, in defendant's case, defendant did not ask any of its expert witnesses what the amount of plastic or elastic deformation might have been in the roof of the Pinto.

In defendant's case, it advanced the theory that plaintiff was ejected from the car before its roof ever struck the pavement, and that plaintiffs, therefore, could not attribute any injuries to the Pinto's roof, whether or not defectively or negligently

designed. On rebuttal, plaintiffs called only Mr. Marcosky. The Court requested an offer of proof. N.T. 9–44. The only part of plaintiffs' offer that is pertinent here was as follows: "I am going to question how much crush there was in the accident vehicle." N.T. 9–45. Also, the *only* reason declared by plaintiffs for offering the testimony was that "if a defendant has developed a theory of ejection, we [plaintiffs] should certainly be permitted to show the site [sic] of the window." N.T. 9–48. In their brief in support of their new trial motion, plaintiffs advance this as the *exclusive* reason for offering the testimony.

The Court permitted Mr. Marcosky to testify about the measured extent of the *plastic* deformation in the Pinto's roof, but refused to permit Mr. Marcosky to testify about the extent of *elastic* deformation. As explained by the Court at trial, such testimony was beyond plaintiffs' offer of proof. More importantly, the evidence did not constitute proper rebuttal. Evidence on rebuttal is properly limited to evidence contradicting evidence offered in defendant's case-in-chief. *McVey v. Phillips Petroleum Co.,* 288 F.2d 53, 54 (5th Cir. 1963); 6 *J. Chadbourn, Wigmore on Evidence* § 1873 (1976). While it is true, as plaintiffs contend, that it is not improper to admit evidence in rebuttal which also supports plaintiffs' case-in-chief, it would be improper to admit evidence in rebuttal which supports plaintiffs' case-in-chief but does not contradict evidence admitted in defendant's case-in-chief. To hold otherwise would be to permit a plaintiff to withhold part of plaintiff's case-in-chief and deprive the defendant of a fair opportunity to meet that evidence in defendant's case-in-chief. In addition, the resulting volleys of evidence back and forth between plaintiff and defendant would undoubtedly confuse even the most conscientious jury. Thus, since Ford did not offer testimony regarding the extent of "plastic" or "elastic" deformation in its case-in-chief, Mr. Marcosky's testimony was clearly improper rebuttal.

Nevertheless, even if the Court did err in refusing Mr. Marcosky's testimony, plaintiffs suffered no prejudice. Plaintiffs' sole reason for offering the testimony was to rebut defendant's theory that Olsen was ejected from the vehicle before the roof was crushed. This theory goes only to the issue of proximate cause. Defendant argued that, even if the roof were defective, the defect did not cause Olsen's injuries because Olsen had been thrown from the vehicle before the roof deformed. The jury's answers to the special interrogatories, however, make it plain that they never reached the question of causation. Thus, whether or not Mr. Marcosky was properly prevented from offering evidence to rebut defendant's ejection theory could not have affected the result in this case.

#### F. Non-Joinder of Dr. Timothy Cooper

Plaintiffs also argue that the Court erred in refusing to permit counsel to join Timothy Cooper, the driver of the vehicle at the time of the accident, as a "third party defendant." To prevent confusion for any who might review the record, the Court notes at the outset that the stipulation submitted to accomplish Cooper's joinder provided that "*plaintiffs* are permitted to file a complaint against Timothy J. Cooper." Stipulation, Docket No. 130. Thus, if joined, Cooper would have been a co-defendant rather than a third party defendant. As to whether or not the Court's refusal to permit Cooper's joinder was error, the reasons for the Court's refusal clearly appear in several places in the record. *See* Transcript of Argument on Discovery, (October 21, 1980), Docket No. 64, at 7–9, 16–18; Memorandum and Order, Docket No. 63 (October 28, 1980); Order, Docket No. 89 (December 8, 1980). For the same reasons, the Court believes that no error was committed. Therefore, the Court will not grant plaintiffs a new trial on this ground.

#### G. Punitive Damages

Plaintiffs contend that it was error for the Court to refuse to charge the jury on punitive damages. The jury, however, in its answer to special interrogatories, found that the Pinto was not defective and that the defendant was not negligent.

Since the jury found there was neither a defective product nor negligent conduct for which the defendant would have been held liable in *compensatory* damages, the jury would certainly have had no basis for imposing *punitive* damages. Thus, any error in the Court's refusal, if error there was, did not prejudice the plaintiffs.

 Under Pennsylvania law, punitive damages are awarded to punish outrageous conduct. *Chambers v. Montgomery*, 411 Pa. 339, 344, 192 A.2d 355, 358 (1963). *See Restatement of Torts* § 908(1) (1939). The Supreme Court of Pennsylvania has further defined "outrageous conduct" to mean " 'acts done with a bad motive or with a reckless indifference to others.' " *Chambers v. Montgomery, supra,* at 344, 192 A.2d at 358, *quoting Restatement of Torts* § 908, Comment b (1939). The Supreme Court of Pennsylvania has also said that punitive damages must be based in malicious, wanton, reckless, willful, or oppressive conduct on the part of the defendant. *Chambers v. Montgomery, supra,* at 344–345, 192 A.2d at 358. Such conduct must appear affirmatively in the evidence and cannot be presumed. *Thompson v. Swank*, 317 Pa. 158, 159, 176 A. 211, 211 (1934). As explained by the Court at the time of its ruling, the defendant's mere failure to conduct a particular test in addition to or instead of those tests it admittedly conducted could not, without more, rise to the level of "outrageous" conduct. *See* N.T. 10–17 to 10–18. Nothing in the record distinguishes defendant's conduct from, at most, mere negligence. To permit the jury to consider punitive damages under the circumstances would be to allow a verdict to be based on mere speculation, prejudice or innuendo.

For both of these reasons, the Court will not grant plaintiffs' motion for new trial on this ground.

### H. Unanimity of the Verdict

 Finally, plaintiffs contend that it was error for the Court, exercising diversity jurisdiction and applying Pennsylvania law, to charge the jury that its verdict must be unanimous. Instead, plaintiffs argue, the Court should have applied a Pennsylvania statute providing that a verdict rendered by five-sixths of the jury shall be the verdict of the jury. *See* 42 Pa.Cons.Stat.Ann. § 5104 (Purdon Supp.1981). This very argument was recently addressed and rejected by the United States Court of Appeals for the Third Circuit, which held instead that the Federal policy favoring unanimous verdicts in civil jury trials prevails even in diversity cases where the relevant state law provides for less than unanimous verdicts in civil cases. *Masino v. Outboard Marine Corp.*, 652 F.2d 330 (3d Cir. 1981). Accordingly, the Court cannot grant a new trial on this ground.

### III. *Conclusion*

In the preceding sections, the Court has primarily addressed those contentions developed at length in plaintiffs' brief, and has found none of them to warrant granting a new trial. The Court has also reviewed the additional contentions raised in plaintiffs' motion but not developed in their brief filed four months after the filing of the motion, and has found them to be similarly without merit. Accordingly, plaintiffs' motion for new trial will be denied.

An appropriate Order will be entered.