Barbara Ellen **BARRIS**, Administratrix of the Estate of Arnold Leroy Barris, III, Deceased, Appellant,

v.

**BOB'S DRAG CHUTES & SAFETY EQUIPMENT, INC., a Michigan corporation, and Stan Hoover, individually and t/d/b/a Stan Hoover, Jr. Racing Enterprises, Appellees.**

No. 81–2875.

United States Court of Appeals, Third Circuit.

Argued May 10, 1982.

Decided Aug. 6, 1982.

* Hon. Joseph S. Lord, III, Chief Judge Emeritus, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Louis M. Tarasi, Jr. (argued), Tarasi & Tighe, Pittsburgh, Pa., for appellant.

James D. Wines, Ann Arbor, Mich. (argued), Robert J. Behling, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for appellee Bob's Drag Chutes & Safety Equipment, Inc.

Before GIBBONS and HUNTER, Circuit Judges, and THOMPSON,[*] District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

*INTRODUCTION*

Barbara Ellen Barris brought this diversity action against the manufacturer and retailer of a shoulder harness, alleging that her husband died as a result of a defect in the harness he was wearing when his sprint car flipped during a collision. After the plaintiff's case-in-chief, the district court directed a verdict for defendant, Bob's Drag Chutes and Safety Equipment, Inc. ("Bob's"), based on the court's conclusion that plaintiff had failed to present a *prima facie* "crashworthiness" case.[1] We have

---

[*] Honorable Anne E. Thompson, United States District Court for the District of New Jersey, sitting by designation.

1. The term crashworthiness means the protection that a passenger motor vehicle affords its passengers against personal injury or death as a result of a motor vehicle accident. 15 U.S.C. § 1901(14) (1976). The crashworthiness doctrine is also referred to as the "second colli-

sion" doctrine. Second collision is defined as the impact of the individual with some part of the automobile after the collision or initial impact. *See Jeng v. Witters*, 452 F.Supp. 1349 (M.D.Pa.1978), *aff'd mem.* 591 F.2d 1335 (3d Cir. 1979). The term second collision has also

concluded that the district court erred in directing the verdict and will remand for proceedings consistent with this opinion.

*FACTS*

On the evening of May 28, 1978, Arnold Leroy Barris, III was killed as he was driving his sprint car in a race at the Tri-City Speedway in Franklin, Pennsylvania. Decedent's sprint car was equipped with a shoulder harness, lap belt, arm restraints and a helmet. During the second heat, the front wheel of the decedent's race car collided with the left rear tire of another sprint car. The collision caused decedent's car to be catapulted into the air. The car then flipped end-over-end a number of times before coming to rest on its wheels.

Witnesses testified that, when the car was in the second flip, decedent's body appeared to come loose inside the roll cage of his car. Evidence produced at trial shows that decedent's head, which was protected by a helmet, hit the roll bars of the car during the flips. The parties stipulated that decedent was killed as a result of the injuries he sustained as the sprint car flipped end-over-end. Appendix at 19–20. After the crash, a rescue crew removed decedent's helmet, lap belt and arm restraints as they extricated decedent from his car. Witnesses who saw the car after the crash testified that the shoulder harness in decedent's car had disintegrated. There was testimony that the shoulder harness was in excellent condition when it, along with the rest of the car, was cleaned before the race. Testimony at trial also indicated that decedent's mechanic, who had inspected the car's safety harness and lap belt prior to the race, agreed with this assessment. Appendix at 144–45, 150–51, 161, 182–83, 196.

The decedent's sprint car, which he purchased new in 1975, came equipped with a Y-type shoulder harness. At the time of the accident, the car was equipped with a replacement Y-type shoulder harness which had been installed in 1977. This harness was manufactured by the defendant. The manufacturer sold its product to retailers, including Stan Hoover, Jr., Racing Enterprises ("Hoover"), from whom decedent purchased it.

Expert testimony at trial indicated that the stitching on this shoulder harness was grossly inferior to the stitching on other harnesses with which it was compared. Appendix at 289. It was the expert's opinion that the shoulder harness failed because the inferior stitching on the harness broke during the collision, causing the harness to come apart. The expert testified that shoulder harnesses with more stitches and stitches arranged in a different way were stronger than shoulder harnesses with stitches like those in decedent's car. In addition to the expert witness's testimony, four eyewitnesses testified that they had watched numerous sprint car races in which the cars flipped over and that they had never seen a driver, other than the decedent, killed in one of these flips. Appendix at 287–89, 57, 109–10, 153–54, 207, 234–35.

*PROCEDURAL HISTORY*

Barbara Ellen Barris, decedent's widow, brought this action against Bob's, the manufacturer of the shoulder harness, and Hoover, the retailer of the harness, under the Pennsylvania Survival Act, 20 Pa.Cons.Stat. Ann. §§ 3371–3373 (1982), and the Pennsylvania Death Act, 42 Pa.Cons.Stat.Ann. § 8301 (1982). Plaintiff alleged that the car's defectively designed or manufactured shoulder harness failed to restrain the decedent under normal use during the flipping episode, thereby causing him to strike the interior of the car and sustain fatal head injuries. Plaintiff relied on the strict products liability doctrine of the Restatement (Second) of Torts § 402A (1965), on negligence theory, and on a contract theory of warranties.

■ At the end of the plaintiff's case, the district court directed a verdict against

been defined to include the impact of the individual with something exterior to the automobile when the individual is thrown from the vehicle after the collision or initial impact. *See*

*Caiazzo v. Volkswagenwerk, A.G.,* 647 F.2d 241, 243 n.2 (2d Cir. 1981); *Jeng v. Witters,* 452 F.Supp. at 1355.

Hoover, the retailer, because Hoover failed to file a timely answer to the plaintiff's complaint. No appeal has been taken from the verdict directed against Hoover. After the plaintiff presented her case against the other defendant, Bob's, the district court granted the defendant's motion for a directed verdict on the ground that the plaintiff had failed to present a *prima facie* crashworthiness case, under the test articulated in *Huddell v. Levin*, 537 F.2d 726 (3d Cir. 1976). Specifically, the court ruled that the plaintiff had failed to demonstrate that the death would have been prevented had a better shoulder harness design been utilized.[2] During the trial, the court excluded testimony of plaintiff's expert concerning a report of a second expert on the strength of materials in the safety harness. The plaintiff appeals from the judgment entered on the directed verdict.

## DISCUSSION

### A. *The Applicable Legal Standard*

The threshold issue before us is whether the district court erred in concluding that

this case was governed by the crashworthiness or second collision doctrine rather than the strict liability standard of the Restatement (Second) of Torts § 402A (1965) ("section 402A").[3] This issue is governed by Pennsylvania substantive law. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). However, the Pennsylvania appellate courts have not had occasion to address a crashworthiness claim. *See Olsen v. United States*, 521 F.Supp. 59, 64 (E.D.Pa.1981).[4] Since we lack authoritative Pennsylvania precedent on the crashworthiness issue, we must predict how the Pennsylvania state courts would decide the issue. *See Huddell*, 537 F.2d at 733. We conclude that the district court improperly decided that the crashworthiness doctrine governed this case; rather, the court should have applied the strict liability standard of section 402A of the Restatement (Second) of Torts.

▮▮▮ The Pennsylvania Supreme Court, in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), adopted the strict products liability

2. After a court determines that the crashworthiness doctrine applies, three requirements must be met. First, "in establishing that the design in question was defective, the plaintiff must offer proof of an alternative, safer design, practicable under the circumstances." *Huddell*, 537 F.2d at 737. Second, the plaintiff must offer evidence of "what injuries, if any, would have resulted had the alternative, safer design been used." *Id.* The third requirement, related to the second, requires the introduction of evidence of the extent to which the plaintiff's injuries were increased by the design defect. *Id.* at 738.

3. Section 402A provides:
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

4. Courts within this circuit have interpreted the crashworthiness doctrine on numerous occasions. *See, e.g., Seese v. Volkswagenwerk, A.G.*, 648 F.2d 833 (3d Cir.), cert. denied, 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981) (applying North Carolina law), *Dawson v. Chrysler Corp.*, 630 F.2d 950 (3d Cir. 1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981) (applying New Jersey law); *Olsen v. United States*, 521 F.Supp. 59 (E.D.Pa. 1981); *Jeng v. Witters*, 452 F.Supp. 1349 (M.D. Pa.1978), aff'd mem., 591 F.2d 1335 (3d Cir. 1979); *Bowman v. General Motors Corp.*, 427 F.Supp. 234 (E.D.Pa.1977); *Hardy v. Volkswagen of America*, 65 F.R.D. 359 (W.D.Pa. 1975); *Dyson v. General Motors Corp.*, 298 F.Supp. 1064 (E.D.Pa.1969). A number of cases dealing with the crashworthiness theory of liability have recently arisen in other circuits. *Mitchell v. Volkswagenwerk, A.G.*, 669 F.2d 1199 (8th Cir. 1982) (applying Minnesota law); *Caiazzo v. Volkswagenwerk, A.G.*, 647 F.2d 241 (2d Cir. 1981) (applying New York law); *Dorsey v. Honda Motor Co.*, 655 F.2d 650 (5th Cir. 1981) (applying Florida law); *Stonehocker v. General Motors Corp.*, 587 F.2d 151 (4th Cir. 1978) (applying South Carolina law).

doctrine of section 402A. To submit a section 402A strict liability case to a jury, it must be shown that the product was defective, that the defect existed while the product was in the control of the manufacturer or retailer, and that the defect was the proximate cause of decedent's injuries. *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 93, 337 A.2d 893, 898–99 (1975); *Forry v. Gulf Oil Corp.*, 428 Pa. 334, 340, 237 A.2d 593, 597 (1968). A product is defective when it is not fit for the intended use for which it is sold. *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 559, 391 A.2d 1020, 1027 (1978); *Salvador v. Atlantic Steel Boiler Co.*, 457 Pa. 24, 32, 319 A.2d 903, 907 (1974). *See also* W. Prosser, Law of Torts 658–660 (4th ed. 1971).

▪ The crashworthiness or second collision doctrine is a variation of strict liability theory, which imposes on the plaintiff more rigorous proof requirements than a typical section 402A action. *See Olsen*, 521 F.Supp. at 63. Manufacturers have long been held liable for injuries proximately caused by a defect where the defect caused the accident. *See MacPherson v. Buick Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916). The crashworthiness doctrine extends the manufacturer's liability to situations in which the defect did not cause the accident or initial impact, but rather increased the severity of the injury over that which would have occurred absent the defective design. *Huddell*, 537 F.2d at 726; *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968). In crashworthiness cases, the courts, adhering to the rule that strict liability attaches only when a product is used in a foreseeable manner,

have said that "an accident is a foreseeable use of an automobile." *Jeng v. Witters*, 452 F.Supp. 1349, 1355 (M.D.Pa.1978), *aff'd mem.* 591 F.2d 1335 (3d Cir. 1979). *Accord, Huddell*, 537 F.2d at 735. We first enunciated the crashworthiness doctrine in *Huddell*, 537 F.2d at 726.[5]

*Huddell* arose out of an automobile collision in which the decedent was injured when a car travelling at least fifty miles per hour hit the decedent's car from behind. The decedent's injuries were exacerbated when he was thrown against a head rest following the collision. There was expert testimony that the head rest was designed in such a way as to expose a passenger's head to a severe, sharp metal edge and that the defect proximately caused decedent's fatal head injuries. The plaintiff sued the automobile manufacturer under section 402A, alleging that the fatal injuries to decedent resulted from the impact of decedent's head with the defectively designed head rest. The plaintiff's theory was that without the defective head rest the decedent would have survived the collision. Ruling that the crashworthiness doctrine applied, we held that the plaintiff's case should not have been submitted to the jury because the plaintiff failed to submit any evidence of the injuries that the decedent would have received in the absence of the defective head rest. In *Huddell*, New Jersey substantive law was applied. A subsequent decision, however, held that the crashworthiness doctrine, as articulated in *Huddell*, was applicable to cases that were governed by Pennsylvania law. *See Jeng*, 452 F.Supp. at 1349.[6]

**5.** In *Huddell*, we discussed in *dictum* the failure of seat belts in regular automobiles installed by the manufacturer. 537 F.2d at 735, 740–41. Our holding in *Huddell* does not mean, of course, that the crashworthiness doctrine applies in every case which involves seat belts. The focus of Judge Aldisert's analysis in *Huddell*, as discussed *infra*, is not on the type of product involved, *per se*, but on the events following the initial crash and the enhanced injuries that result from those events.

**6.** The court in *Jeng* stated that the crashworthiness doctrine "is the law upon which the jury was instructed in this case, and we believe that

it should be accepted as correct until the Pennsylvania courts can provide guidance on the matter." 452 F.Supp. at 1361. Prior to the *Huddell* and *Jeng* decisions, a federal district court, applying Pennsylvania law, decided that Pennsylvania would follow *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968), which held that a manufacturer is liable to an occupant of an automobile for injuries enhanced by a defectively designed component part in the vehicle, even though the defective part did not cause the initial accident. *Dyson v. General Motors Corp.*, 298 F.Supp. 1064 (E.D.Pa.1969). Before concluding that Pennsylvania would follow the *Larsen* approach, the

In *Huddell*, we defined crashworthiness as the ability of a motor vehicle to protect its passengers from exacerbated injuries after a collision. 537 F.2d at 735.[7] When discussing the crashworthiness standard, courts frequently use the phrase "enhanced injury." Enhanced injury refers to the degree by which a defect aggravates collision injuries beyond those which would have been sustained as a result of the impact or collision absent the defect. *See Huddell*, 537 F.2d at 737–38. Under the crashworthiness theory the claimant does not allege that a defect in the automobile caused the accident or initial impact. Rather, the claimant alleges that injuries were more severe than they would have been had the car been properly designed.

The effect of the crashworthiness doctrine is that a manufacturer has a legal duty to design and manufacture its product to be reasonably crashworthy. *Huddell*, 537 F.2d at 735. *Accord, Olsen*, 521 F.Supp. at 63. In terms of strict product liability, this means that a manufacturer has to include accidents among the "intended" uses of its product. *Huddell*, 537 F.2d at 735. A manufacturer who fails to fulfill this legal duty will be liable to the passenger of a car whose injuries are increased due to the design defect in the automobile. Liability will attach even though the defect in manufacture or design did not cause the initial accident or impact.

In the case at bar, the district court erroneously concluded that the crashworthiness standard applied.[8] The facts before us present a classic section 402A strict liability case in which an allegedly defective product, a shoulder harness, failed during the

car's flip, causing decedent to come loose in the race car and suffer fatal injuries. This particular shoulder harness was intended to restrain a person in an automobile used in a sport in which aerial flips are expected occurrences. The jury could have found that the shoulder harness was not fit for this intended use. *See Azzarello*, 480 Pa. at 559, 391 A.2d at 1027. The evidence would support a finding that the harness did not have a sufficient number of stitches and the stitches on it were not arranged so as to maximize the harness's strength. Appendix at 287–88, 332–33. The jury could have concluded from the evidence before it that the harness, as manufactured by defendant, was defective, that the defect existed while the harness was under defendant's control, and that the defect proximately caused decedent's injuries. The district court should have concluded that the strict products liability doctrine of section 402A, as enunciated in *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. at 93, 337 A.2d at 898–99, applied in this case.

### B. *The Sufficiency of the Evidence Under Section 402A*

Having concluded that the crashworthiness doctrine was improperly invoked by the district court, we must address the issue of whether there was sufficient evidence under the section 402A standard to submit that issue to the jury. We conclude that the evidence on the record was sufficient to create jury questions on whether the shoulder harness was defective and whether the defect was the proximate cause of death.[9] *See Berkebile*, 462 Pa. at 93, 337 A.2d at 898–99. In the instant case the district court directed a verdict against the plain-

---

court in *Dyson* carefully traced the development of Pennsylvania tort law.

7. *See also Dreisonstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066, 1069 n.3 (4th Cir. 1974), where the court defines the term crashworthiness.

8. Plaintiff argues that the crashworthiness doctrine is inapplicable because earlier crashworthiness decisions involved the manufacturer of the motor vehicle itself, rather than a component parts manufacturer, such as Bob's. The

defendant did not bring to our attention, and we were unable to find, any reported case in which the crashworthiness doctrine has been asserted against a component parts manufacturer.

9. The district judge below stated: "If the jury believed all of your evidence, they could believe there was a defect, and the defect was in the design of this particular belt, that it was designed with too few stitches, and the way the stitching was done." Appendix at 365.

tiff Barris. In a case in which a verdict has been directed, we must view the evidence in the light most favorable to the party against whom the motion for a directed verdict was made and give that party the benefit of all favorable inferences which the evidence fairly supports. *Continental Co. v. Union Carbide*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir. 1969).

■ The existence of a defective condition can be established through an expert's opinion that was formed after an examination of the product. *See Bialek v. Pittsburgh Brewing Co.*, 430 Pa. 176, 181, 242 A.2d 231, 233 (1968). *Accord, Huddell*, 537 F.2d at 734 (applying New Jersey law). Plaintiff's expert testified that, in his opinion, inferior stitching on the harness caused the shoulder harness to fail. The shoulder harnesses he tested, which had more stitches and stitches arranged in a different pattern, were stronger than shoulder harnesses with stitching like that in the decedent's car. It was the expert's opinion that the stitching pattern on the shoulder harness was inadequate to support the force of a person being thrown against it in a car flip. The expert was unable to give a reasonably certain conclusion about the precise force that the decedent exerted against the shoulder harness in this collision. But in the expert's laboratory tests, belts with stitching like that in decedent's race car failed when a force of 1000 pounds was exerted against them, while shoulder harnesses with other stitching patterns did not fail until a force of 3000 to 4000 pounds was applied against them. There was also expert testimony that, under the Society of American Engineer's standard, a seat belt in a passenger car should be able to withstand at least 4000 pounds of force.

■ In addition to expert testimony on design defect, a defective condition in a product can be established by the presentation of other types of circumstantial evidence. *Gill v. McGraw Elec. Co.*, 264 Pa.Super. 368, 399 A.2d 1095, 1101 (1979); *Cornell Drilling Co. v. Ford Motor Co.*, 241 Pa.Super. 129, 136–37, 359 A.2d 822, 825–26 (1976). Evidence of a malfunction is one type of circumstantial evidence that can be used in establishing a defective condition. *Cornell*, 241 Pa.Super. at 137–42, 359 A.2d at 826–28; *MacDougall v. Ford Motor Co.*, 214 Pa.Super. 384, 391, 257 A.2d 676, 680 (1969). Other types of circumstantial evidence which tends to indicate that a defect existed in a product are "the occurrence of the accident a short time after the sale," the "same accidents in similar products," "the elimination of other causes of the accident" and "the type of accident that does not happen without a defect." *Cornell*, 241 Pa. Super. at 140, 359 A.2d at 827, *citing* W. Prosser, Law of Torts 673–74 (4th ed. 1971).

■ Testimony from lay witnesses who possessed knowledge about sprint car races supports the conclusion that a jury question exists on the section 402A issue. Eyewitnesses testified that they had observed a large number of sprint car races and that aerial flips were common occurrences in these races. These witnesses said that the drivers had always walked away from such flips unharmed. Another lay witness who regularly watched sprint car races testified that he had never seen a sprint car driver injured as a result of aerial flips. Viewing the evidence in the light most favorable to plaintiff, we conclude that there was sufficient evidence to submit to the jury the questions of whether the shoulder harness was defective and whether the defect proximately caused decedent's fatal injuries.[10]

10. Plaintiff also contends that under Rule 703 of the Federal Rules of Evidence, 28 U.S.C. Rule 703 (1976), she should have been allowed to introduce through her expert the report of a second expert who analyzed the fibers in the shoulder harness webbing. The court, in excluding this testimony, reasoned that the expert had not indicated that his opinion was in any way based upon knowledge of the composition of the fibers in the webbing. It concluded that the plaintiff was attempting to introduce data and facts from some other expert on unrelated matters through this witness. Appendix at 314. Rule 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or infer-

*CONCLUSION*

For the foregoing reasons we will vacate the district court's grant of a directed verdict for the defendant, and we will remand the case to the district court for a new trial consistent with this opinion.

ence may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

In addressing the plaintiff's contentions, "we recognize that the admission of expert testimony rests within the sound discretion of the district court and that the district court will be reversed only for an abuse of that discretion." *Seese v. Volkswagenwerk, A.G.*, 648 F.2d 833, 844 (3d Cir.), *cert. denied,* — U.S. —, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981).

Under Rule 703, an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts. *United States v. Hill,* 655 F.2d 512, 516 (3d Cir. 1981); *Seese,* 648 F.2d at 845. In the instant case, the plaintiff's expert did not show through his testimony that he based his opinion on the facts or data compiled by the other expert, as Rule 703 requires. Specifically, the expert did not indicate that knowledge about whether the webbing in the shoulder harness was cut or torn was utilized in formulating his opinion on the shoulder harness's defective condition. Thus, the district court did not abuse its discretion when it precluded plaintiff's expert from testifying about the report of the second expert.