Argued February 21, affirmed May 8, 1978

STATE OF OREGON, *Respondent,*
*v.*
DONALD DOUGLAS HULL, *Appellant.*
(No. Cr 1491, CA 7788)
578 P2d 434

J. Marvin Kuhn, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Jesse R. Himmelsbach, Jr., District Attorney, Baker, argued the cause and filed the brief for respondent.

Before Schwab, Chief Judge, Lee, Richardson and Joseph, Judges.

RICHARDSON, J.

## RICHARDSON, J.

Defendant appeals his conviction by jury verdict of two counts of murder. There are five assignments of error. (1) Defendant argues the court erred when it allowed the prosecution to cross-examine a psychologist as to her knowledge of what defendant did on the day before and the day of the murders. (2) The failure to grant defendant's motion for mistrial on this basis is also assigned as error. (3) Defendant further objects to the admission of certain out of court statements as hearsay, (4) a jury instruction defining extreme emotional disturbance, and (5) the admission of several photographs and slides of the victims.

The murder victims, Darlene Hull (Darlene) and Tamra Shove (Tamra), were mother and child, respectively. Darlene had been married to the defendant's brother before her divorce in 1975. The defendant and Darlene lived together for a time, but the couple experienced difficulties resulting in defendant's moving in with a friend, Floyd Thornton, when defendant was released from jail on an unrelated conviction. The defendant proposed to Thornton the double murder and rape of Darlene and Tamra one week before August 13, 1976, the day the two were killed. A vaginal specimen taken from Tamra indicated she had been sexually assaulted. The defendant was identified at trial as having been seen on the morning of the murders in the Washington Gulch area, near where the victims' bodies were found, beating upon a young girl and chasing her in a blue pickup truck.

After defendant's arrest in Portland he told a police officer that he had gone to Darlene's home the morning of the murders to talk about a reconciliation and to borrow her pickup truck. Defendant indicated he, Darlene and Tamra drove around for a time discussing the possibility of their getting back together before he dropped them off at their home. Defendant told the officer he then drove to Portland. Defendant's mother-in-law, Mrs. Frances Austin, testified defendant arrived at her home in Portland on the afternoon of

August 13, 1976, in a blue pickup truck. He had blood on his pants and told her he had killed two people, telling two or three different versions. Defendant had been drinking. In the evening defendant went to a bar with David Brumbaugh where defendant stated he had killed two people and had raped a thirteen year old, forcing her mother to watch. The defendant did not testify at his trial.

Defendant presented evidence that he was under extreme emotional distress in August of 1976 to establish that if the jury found he had committed the crimes as charged his conviction should be mitigated from murder to manslaughter.[1] On direct examination of Dr. Pamela Munter, a clinical psychologist, defendant was characterized as an alcoholic of "dull-normal" intelligence from an economically and emotionally deprived background. In her opinion, defendant could have been in an alcoholic "black-out" on the day of the murders. She opined defendant was suffering from extreme emotional disturbance at the time of the murders.

During cross-examination of Dr. Munter, the district attorney asked on several occasions what she thought the defendant did on August 12th and 13th of 1976. This line of questioning was objected to as being beyond the scope of direct-examination and as calling for an opinion by the witness on a matter of which she had no personal knowledge and which was not within her field of expertise.

The following exchange is indicative of the questioning objected to on cross-examination:

---

[1] ORS 163.115(2) reads as follows:

"For the purposes of paragraph (a) of subsection (1) of this section, a homicide which would otherwise be murder is committed under the influence of extreme emotional disturbance when such disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act, and for which disturbance there is a reasonable explanation. The reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person in the actor's situation under the circumstances as the actor reasonably believes them to be."

"Q  *  *  * What do you think he did on August 12th and 13th?

"A  Well, I've got a little bit of detective in me and I think that there are lots of alternative explanations and I'm not sure which of them are accurate.

"Q  I'm not asking for alternative explanations. I'm asking you what do you think he did—a very simple question.

"A  I don't know. That hasn't been relevant to my examination of Mr. Hull. I found no need to decide for myself whether he in fact committed the crimes he's accused of or not.

"Q  Do you have any idea what he did?

"A  I know what he's accused of doing, yes.

"Q  Do you have any idea what he did?

"A  No, I do not.

"Q  And still you have an opinion that at the time he was extremely emotionally disturbed?

"A  I know from the reports of other people what he said to various people at the time and the behavior that's been reported by others observing him and that forms part of my opinion.

"Q  Alright, based upon those reports, what you'd been told by Mr. Hull, his counsel, from whatever source, what do you think he did on August 12th and 13th, 1976?

"MR. COUGHLIN: Objection. It's beyond the scope of the direct, your Honor, absolutely. Totally outside of it.

"THE COURT: Objection will be overruled. Witness may answer if she can.

"A  I know that he drank heavily during those days. That he was without sleep. That he was worried a good deal about a woman that he was involved with. That he had a friend that he was staying with and that he, Mr. Hull, told me that he remembered getting up after drinking excessively and sleeping for two hours and going to see two people, I believe who have been identified as Darlene and Tammy and took them out for a ride and that he brought them back to the house. I cannot draw any more conclusions other than that.

"BY MR. HIMMELSBACH:

"Q  Alright. Is that what you think that he did?

"A  I don't know, sir. I have no idea what he did. I wasn't there."

[ 151 ]

The witness never did answer as to whether she believed the defendant did in fact commit the homicides. She repeatedly testified she did not know. As to her information concerning defendant's activities on the days in question, all but one fact considered by Dr. Munter came into evidence through other witnesses. The one fact not so introduced was that defendant had come into the victims' home by a bedroom window when he visited the residence on the day of the killings. However, this statement was conveyed to her by defendant during her examination of him prior to trial.

The psychologist had opined defendant was suffering from extreme emotional disturbance during the time the murders were committed. On direct and cross-examination she testified this opinion was based upon a review of defendant's medical and social history including his I.Q. and his alcoholism. Her opinion was not based, she stated, on what he actually did the day of the murders and the day before.

■ Cross-examining an expert witness is a formidable task and the cross-examiner must be given great latitude in testing the basis of the opinion. *Samuel v. Vanderheiden,* 277 Or 239, 560 P2d 636 (1977); *Wulff v. Sprouse-Reitz Co., Inc.,* 262 Or 293, 498 P2d 766 (1972). It is proper to test by questions to the expert the factual data used in arriving at a conclusion and equally proper to elicit from the witness that she was unaware of relevant facts that may affect the opinion.

■■ The cross-examiner may seek to demonstrate to the jury that a change in the facts the expert assumes to be true may necessitate a modification of the opinion or dilute the value of the opinion in the minds of the jury. We agree with defendant's contention that a psychologist cannot be asked for an opinion as to whether the defendant committed the crime charged. Although the prosecutor's questions at times appeared to be in that vein this was not the thrust of his questioning of the psychologist. He was not seeking a

professional opinion from the doctor that defendant had actually committed the crimes but merely testing the factual basis of the opinion given of defendant's mental state. The questions were not beyond the scope of the direct examination nor improper cross-examination of an expert witness. The motion for mistrial based upon the asserted improper cross-examination was properly denied.

■ The second ground for a mistrial related to the prosecutor's conduct immediately following the above described cross-examination:

> "MR. GABAY [Defendant's Attorney]: * * * I very firmly also join in the request for a mistrial and would ask that the Court direct the record reflect fully that the District Attorney not only has undertaken this conduct, but also at the end of that answer, the look of 'smug' I would take to be an understatement. My powers of description are limited, but it was a very expressive look with his total face and facing towards the jury."

The record, at least in the present state of the art, cannot reflect the facial expression of counsel. The trial court is in a superior position to observe the conduct of counsel and guard against any impropriety that may have occurred. We can discern no abuse of discretion in denying the motion for mistrial.

The defendant objected to the testimony of two witnesses on the ground that it was hearsay and moved for a mistrial when the answer of one witness disclosed that defendant had been in jail for cattle rustling. We discuss the two witnesses' testimony separately. Tracy Shove, a daughter of the victim Darlene, testified to a telephone conversation she overheard between Darlene and the defendant. She testified, over a hearsay objection, to a statement made on the telephone by her mother:

> "Q [Prosecutor] What else did your mother tell Don [Defendant] during the phone call that Noontime?
>
> "* * * * *
>
> "A That she was taking care of his kids all the time when he was in jail for cattle rustling and she brought him cigarettes."

[ 153 ]

Defendant moved for a mistrial on the ground the answer contained evidence defendant may have committed another crime. The trial court denied the motion for mistrial but instructed the jury to disregard the answer and strike it from their consideration. Since the answer was stricken and thus was not to be used by the jury in its deliberations it is unnecessary to review the contention that it was hearsay.

Defendant argues the curative instruction by the court was ineffective to remove the prejudicial impact of the statement regarding another crime. He points out he was being tried in an Eastern Oregon County populated by many cattle ranchers and the information defendant may have been a cattle rustler would be particularly damaging.

A motion for mistrial on the ground that the state has improperly referred to defendant's prior criminal activity is addressed to the discretion of the trial court. In exercising this discretion the trial court should be given wide latitude with the admonition that a mistrial should be granted if

"* * * it is apparent that some aspect of the conduct of the trial has interfered with a defendant's ability to obtain a fair adjudication of the facts. * * *" *State v. McFarland,* 30 Or App 93, 97, 566 P2d 539 *rev den* (1977); *State v. Treit,* 29 Or App 461, 564 P2d 708 (1977).

It was not error to deny the mistrial. The witness's statement, stricken by the court, was the single reference to cattle rustling and was not otherwise called to the jury's attention. The evidence was not intentionally introduced by the state but volunteered unexpectedly by the witness. The court adopted a proper route of removing potential prejudice by a curative instruction. We have enough confidence in the jury system to conclude the jurors would abide by the court's instructions.

The second witness whose testimony is challenged was a neighbor of Darlene. He overheard Darlene, whom he stated always talked in a loud voice, while he

was sitting in his home. The conversation occurred during the same period as the telephone conversation testified to by Tracy Shove. The substance of his testimony was that Darlene was angry and was expressing animosity toward the person she was talking with. The state wished the jury to draw the inference that the witness overheard the telephone conversation between Darlene and the defendant. It was offered to establish a motive for Darlene's murder.

Assuming the testimony was hearsay and thus inadmissible the error does not require reversal. The record is replete with other evidence, not claimed as erroneously received, which establishes animosity between Darlene and the defendant. On at least two occasions prior to the murders defendant had discussed with his roommate, Floyd Thornton, his plan to have intercourse with Darlene and Tamra and then to kill them. He told two other witnesses on separate occasions that he was going to "burn" Darlene for things she had done to him. In view of the substantial evidence of guilt and the other evidence of the feelings between Darlene and defendant the admission of the challenged evidence was harmless error. Or Const, Art VII, § 3; *State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973).

Defendant excepted to the court's failure to give his requested instruction defining "extreme emotional disturbance." Instead the court gave an instruction in substantially the form we found not to be erroneous in *State v. Akridge,* 23 Or App 633, 543 P2d 1073 (1975), *rev den* (1976). Defendant's principal objection is that his requested instruction contained the alternate dictionary definitions of the word "extreme" while the court's instruction gave only one possible definition. The thrust of the holding in *State v. Akridge, supra,* was that since "extreme" is not defined in the statute it is to be given its customary meaning. It is doubtful that any definition of that common word is necessary. The definition given by the court was not error.

[ 155 ]

In the final assignment of error the defendant asserts several photographs and transparent slides of the two victims were erroneously admitted. He argues that they were unnecessary to assist the coroner in his testimony and were cumulative and so gruesome as to make them prejudicial to defendant. The trial court examined the exhibits outside the presence of the jury following defendant's objection and excluded several photographs and slides as cumulative.

The question of cumulativeness and prejudicial impact is addressed to the discretion of the trial court. *State v. Oveross,* 18 Or App 300, 525 P2d 176, *rev den* (1974); *State v. Tucker,* 5 Or App 283, 483 P2d 825, *rev den* (1971). We find no abuse of discretion.

Affirmed.