Argued and submitted July 16, 1982, affirmed February 16, reconsideration denied April 1, petition for review allowed June 21, 1983 (295 Or 259) See 297 Or 375, 686 P2d 1001 (1984)

# STATE OF OREGON,
*Respondent,*

*v.*

# CALVIN ROY OTT,
*Appellant.*

(80-522-C; CA A23254)

659 P2d 388

Donald F. Myrick and Donald H. Coulter, Grants Pass, argued the cause for appellant. On the brief were Donald H. Coulter, and Myrick, Coulter, Seagraves, Myrick & Adams, Grants Pass.

William F. Gary, Solicitor General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Christine L. Dickey, Assistant Attorney General, Salem.

Before Richardson, Presiding Judge, Thornton, Senior Judge, and Van Hoomissen, Judge.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Defendant appeals his conviction for the murder of his wife. Former ORS 163.115(1).[1] He makes six assignments of error. We affirm.

It is unnecessary to detail the facts of the homicide in discussing the assignments of error. There was no dispute that defendant intentionally killed his wife; the principal issue at trial was defendant's defense of extreme emotional disturbance which would allow the jury to find him guilty of manslaughter in the first degree. Former ORS 163.115(2). The first two assignments of error concern instructions given by the court regarding the defense of extreme emotional disturbance. The next three assignments relate to the state's expert witness, and the final one contends that the court submitted a confusing verdict form to the jury.

■ Regarding the first two assignments, defendant makes six specific arguments. First, he contends that the court erred in defining the word "extreme" in the statutory phrase "extreme emotional disturbance."[2] The court instructed the jury:

---

[1] Subsequent to trial in this case ORS 163.115 was amended. *See* Or Laws 1981, ch 873, § 5.

[2] The full instructions given to the jury bearing on extreme emotional disturbance are:

"So far as here applicable, the statutory law of Oregon provides in effect that a criminal homicide when it is committed intentionally constitutes murder unless at the time of the homicidal act the Defendant was under the influence of an extreme emotional disturbance, when such disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act, and for which disturbance there is a reasonable explanation. The reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person in the actor's situation under the circumstances as the actor reasonably believes them to be.

"In this case there may be evidence to show that if the Defendant did in fact commit a homicide as charged, he did so while he was under the influence of an extreme emotional disturbance. The concept of extreme emotional disturbance is not to be confused with the defense of mental disease or defect, which defense prevents a Defendant from being held criminally responsible. The defense of mental disease or defect has not been raised and therefore is not applicable to this case. On the other hand, a Defendant who intentionally kills another person, the act being committed under the influence of extreme emotional disturbance, is still held criminally responsible, but is guilty of the lesser offense of manslaughter in the first degree instead of murder.

"I instruct you that the concept of extreme emotional disturbance involves several issues, all of which must be considered by you. One, the homicidal act must have been committed under the influence of an extreme emotional disturbance, and two, the extreme emotional disturbance must not be the result of the Defendant's own intentional, knowing, reckless or criminally negligent act. Thus, a person may not form an intent to commit murder and later because of that intent become extremely emotionally disturbed, and three, the extreme disturbance must be an extreme emotional disturbance. You are instructed that there are varying degrees of emotional disturbance. Not every disturbance is an extreme emotional disturbance in the law. In determining what the term extreme means with reference to extreme emotional disturbance I instruct you that the term means the outermost or furtherest, most remote in any direction, final or last, and four, there must be a reasonable explanation to the extreme emotional disturbance and its resulting homicidal act.

"I instruct you that the reasonableness of the explanation for the extreme emotional disturbance shall be determined from the standpoint of an ordinary person in the Defendant's situation under the circumstances as the Defendant reasonably believes them to be. You are further instructed that when you consider the reasonableness of the explanation for an extreme emotional disturbance and its resulting homicidal act, you are not to use the Defendant's scheme of moral values or the Defendant's personality characteristics. You may only use the scheme of moral values and personality characteristics which would be possessed by an ordinary person in our society today, and fifth, the prosecution must prove the nonexistence of any extreme emotional disturbance beyond a reasonable doubt.

"Extreme emotional disturbance simply means, in the end, that an actor's loss of self control can be understood by a jury in terms that arouse the jury's sympathy to such an extent that the jury feels that the criminal consequence of murder ought, under all the circumstances, to be mitigated to manslaughter in the first degree.

"You are instructed that the State must prove all of the elements of the charge of murder beyond a reasonable doubt as previously instructed. However, to prove the nonexistence of the concept of extreme emotional disturbance beyond a reasonable doubt the State need only prove one of the following beyond a reasonable doubt: One, the homicidal act was not committed under the influence of an extreme emotional disturbance, or two, extreme emotional disturbance was the result of the Defendant's own intentional, knowing, reckless or criminally negligent act, or three, the emotional disturbance was not an extreme one as I have defined that term, or four, there was no reasonable explanation for the extreme emotional disturbance and its resulting homicidal act when the reasonableness of the explanation has been determined from the standpoint of an ordinary person in the Defendant's situation under the circumstances as the Defendant's reasonably believed them to be.

"Extreme emotional disturbance is not to be measured in point of time. In other words, extreme emotional disturbance is not necessarily created in a sudden heat of passion or triggered by a sudden or provocative event. It may be created over an extended period of time. In order to be a mitigating factor in a homicide, however, it must exist at the same time as the homicidal event."

"* * * In determining what the term extreme means with reference to extreme emotional disturbance I instruct you that the term means the outermost or furtherest, most remote in any direction, final or last * * *."

The identical definition was expressly approved in *State v. Akridge,* 23 Or App 633, 635-36, 543 P2d 1073 (1975), *rev den* (1976). Defendant urges that we now treat *Akridge* as "repudiated" on the basis of the subsequent decisions in *State v. Carson,* 292 Or 451, 640 P2d 586 (1982), and *State v. Hull,* 34 Or App 147, 155, 578 P2d 434 (1978). We are not pursuaded by defendant's analysis of those two cases that the definition in *Akridge* has been repudiated.

■ Defendant's second argument is that the court erred in defining "extreme" while not defining the phrase "extreme emotional disturbance" as a unitary concept. "Extreme" delineates the intensity of the emotional disturbance necessary to mitigate intentional homicide to manslaughter. The definition of extreme did not result in an incorrect instruction to the jury regarding the meaning of extreme emotional disturbance.

■ Defendant's third argument is to the effect that by using "extreme" 12 times in the instructions the court unduly emphasized that term. As the state points out, the word was actually used 13 times by the court, but that in most instances it was used in conjunction with the entire phrase "extreme emotional disturbance." The use of the term was a necessary part of the instructions, and we do not agree that the term and its definition were unduly or unnecessarily emphasized.

■ Fourth, defendant argues that the instructions stated an objective test for determining extreme emotional disturbance and did not allow the jury to give proper regard to defendant's subjective situation. The court instructed the jury that, in considering the reasonableness of the claim of extreme emotional disturbance, it was "not to use defendant's scheme of moral values or the defendant's personality characteristics" but was to use only "the scheme of moral values and personality characteristics which would be possessed by an ordinary person in our society today." Defendant contends that the statute focuses on defendant's subjective situation at the time of the homicide and that

the instruction improperly suggested an objective analysis. Immediately before the challenged instruction the court stated:

> "I instruct you that the reasonableness of the explanation for the extreme emotional disturbance shall be determined from the standpoint of an ordinary person in the Defendant's situation under the circumstances as the Defendant reasonably believes them to be. * * *"

That language was quoted from the statute and correctly informed the jury how it was to consider defendant's situation.

■ Defendant's fifth argument is that the instruction improperly made extreme emotional disturbance a part of the intent element of the crime, contrary to statute. In instructing on extreme emotional disturbance, the court discussed it in terms of the "resulting homicidal act." The statute (former ORS 163.115(2)) reads in part: "* * * [A] homicide which would otherwise be murder is committed under the influence of extreme emotional disturbance when * * *." Referring to extreme emotional disturbance and a homicidal act is technically incorrect; however, in the context of all the instructions the jury could not have been misled into believing that extreme emotional disturbance is part of the intent element of the crime. The court instructed the jury:

> "Extreme emotional disturbance simply means, in the end, that an actor's loss of self control can be understood by a jury in terms that arouse the jury's sympathy to such an extent that the jury feels that the criminal consequences of murder ought, under all the circumstances, to be mitigated to manslaughter in the first degree."

■ Defendant's final argument concerning the two challenged instructions is that the court's treatment of the term "extreme" defines the term in the abstract without relating it to defendant's individual circumstances. He contends that the term should relate to the greatest degree of disturbance from the norm for the individual defendant and cites cases from other jurisdictions that have adopted the Model Penal Code definition of extreme emotional disturbance. Oregon did not adopt verbatim the extreme emotional disturbance provision of the Model Penal Code

but enacted a modified version that incorporates a more objective test. *See Smith v. Cupp,* 55 Or App 970, 640 P2d 682, *rev den* 293 Or 103 (1982); *State v. Carson, supra.* The instructions reflected the proper test under the statute.

Defendant's next three assignments of error concern the admissibility of the testimony of Dr. Thompson, the state's expert witness. Shortly after defendant was arrested and before he was arraigned, he agreed to an examination by Dr. Gardner, a psychiatrist who concluded that defendant was not suffering from extreme emotional disturbance at the time of the homicide. Some months later, after defendant had filed notice of intent to rely on the defense of extreme emotional disturbance, the state obtained an order for defendant's examination by Dr. Thompson. The order specified that defendant need not answer any questions concerning his conduct at or near the time of the homicide. *See State ex rel Ott v. Cushing,* 289 Or 705, 617 P2d 610 (1980). Defendant chose not to answer questions concerning the commission of the offense or his mental condition. Following the interview, Dr. Thompson reported that he was unable to reach a conclusion as to defendant's mental condition relative to the crime because of defendant's refusal to answer the questions. *See State ex rel Ott v. Cushing,* 291 Or 355, 630 P2d 861 (1981).

At the beginning of trial, all witnesses were excluded from the courtroom at the state's request. Defendant testified concerning the events before and during the homicide. Immediately following his direct testimony, the state moved for and was granted an order directing defendant to submit to another examination by Dr. Thompson. During the recess and before the examination, the prosecutor summarized defendant's testimony for Dr. Thompson. During the subsequent interview the doctor questioned defendant about the events surrounding the homicide. Defendant, having waived his right to remain silent by testifying, answered the doctor's questions. Dr. Thompson testified, over objection, that in his opinion defendant was not suffering from an extreme emotional disturbance at the time of the homicide.

Defendant's assignments of error relating to Dr. Thompson's testimony present two essential arguments;

first, that the prosecutor violated the order excluding witnesses and, second, that there was no showing that a second psychiatric examination was necessary in mid-trial.

■ Defendant's first contention is, essentially, that he waived his constitutional protection against self-incrimination in reliance on the exclusion of witnesses, including Dr. Thompson. Because Dr. Thompson had initially reached no conclusion regarding defendant's mental state and would not be able to hear defendant's testimony to support a medical opinion, defendant believed that he would not be harmed by testifying. He contends that exclusion of witnesses prohibited the prosecutor from disclosing any testimony to Dr. Thompson outside the courtroom and argues that the information disclosed was the basis for the doctor's opinion. The policy served by excluding witnesses is to prevent a witness' testimony from being tainted or influenced by hearing the testimony of a prior witness. *State v. Bishop,* 7 Or App 558, 492 P2d 509 (1972). That policy is not necessarily applicable when the witness excluded is an expert who offers his opinion based on evidence introduced during trial. As the state points out, the prosecutor could have posed a hypothetical question to Dr. Thompson constructed from defendant's testimony and elicited an opinion on the assumed facts. Additionally, Dr. Thompson interviewed defendant during a recess of the trial and obtained essentially the same information disclosed in defendant's testimony. In that context we conclude that the court did not err in allowing him to testify.

Defendant contends that the state did not show a sufficient basis for a second psychiatric examination during trial. In *State v. Akridge, supra,* we held that it was not error to allow the state to have the defendant examined by a psychiatrist after trial had begun and the defendant had testified. Defendant submits that *Akridge* is distinguishable, because in that case the state had not had a previous examination of the defendant. He argues that here the state had already obtained one psychiatric examination as a matter of right under ORS 163.135(5) and had to establish a necessity for a second.

■ Assuming that the second examination by Dr. Thompson during trial was discretionary and not a matter

of right, we review only for abuse of discretion. Contrary to defendant's assertion, the prosecutor stated the necessity for the second examination in his written motion.

"[The State] respectfully requests the Court for an Order to allow Dr. Jeffrey Thompson a qualified psychiatrist to psychiatrically examine [defendant] in that an earlier examination ordered by the Court was not able to be completed as a result of the defendant exercising his privilege against self-incrimination. That privilege is now no longer available to defendant as a result of his testimony about the events and its resulting waiver."

At the time defendant was tried, the state had the burden to disprove the defense of extreme emotional disturbance. *Shepard v. Bowe*, 250 Or 288, 442 P2d 238 (1968). The trial court said it would not speculate whether Dr. Gardner's testimony was sufficient to meet that burden and granted the motion. We conclude that the court did not abuse its discretion by allowing a second examination.

■ In his final assignment defendant contends that the court erred in submitting a confusing verdict form to the jury. It reads, in pertinent part:

"We, the jury, duly empaneled and sworn to try the above entitled case, all of our number concurring, find the Defendant:

"( ) Guilty of Murder.

"We the jury, duly empaneled and sworn to try the above entitled case, ten (10) or more of our number concurring, find the Defendant:

"( ) Guilty of Manslaughter in the First Degree.

"( ) Not Guilty."

Defendant argues that the positioning of the phrase "Not Guilty" appears to make it referrable only to the charge of manslaughter and does not clearly indicate the number of jurors required to concur in a finding of not guilty. We do not share defendant's conclusion that the verdict form was confusing. ORS 136.450 provides that any verdict, other than one for murder, may be returned by agreement of at least 10 jurors. The jury was faced with three alternatives, and the verdict form indicated clearly the number required to return each of the three alternative verdicts.

Affirmed.